WALTER J. ROTHSCHILD, Judge.
 

 |aOn January 10, 2008, a Jefferson Parish Grand Jury indicted defendant, Cody Wright, with the second degree murder in violation of LSA-R.S. 14:3o.!.
 
 [1]
 
 Defendant was arraigned on January 16, 2008, and pled not guilty. On July 16, 2008, the State severed defendant from his co-defendants for trial. The case was subsequently tried before a 12-person jury, which found defendant guilty of the responsive verdict of manslaughter. The trial judge sentenced defendant to imprisonment at hard labor for 25 years. On December 9, 2009,
 
 *91
 
 defendant filed a timely motion for appeal that was granted. On that same date, defendant also filed a timely motion to reconsider sentence that was denied after a hearing on March 4, 2010.
 

 \ «FACTS
 

 On November 7, 2007, Detective Solomon Burke of the Jefferson Parish Sheriffs Office (JPSO) was on Fredericks Street in Gretna when he heard two gunshots. He got in his ear and drove down Fredericks Street in the direction of the gunshots. As he did so, he saw several people running near the intersection of Fredericks and Helen Streets. The detective turned on Helen Street and saw that other detectives were already there.
 

 After Detective Burke learned that someone was shot in the doorway of 305 Helen Street, he started canvassing the neighborhood to locate evidence and witnesses. While doing so, Detective Burke located Alfred Perry, Jr., age 16, who had information related to the case. Because Mr. Perry was very nervous and worried about what the neighbors would think, Detective Burke told Mr. Perry to lie down in the back of the police car. Afterward, Mr. Perry was transported to the investigations bureau.
 

 JPSO Detective Jeffery Rodrigue also responded to the scene. When he arrived, he saw the victim, later identified as Rolando Cue Zerat, lying face down on the kitchen floor with a gunshot wound to the back. Detective Rodrigue learned that, before being shot, Mr. Zerat was standing outside his residence at 305 Helen Street talking on his cell phone to his mother in Guatemala.
 

 Afterward, Detective Rodrigue went to the bureau where he interviewed Mr. Perry. Mr. Perry gave a statement, looked at photographic lineups, and identified Kelvin Leagea (whose nickname was “Gummy”), Clarence Carr, and defendant as suspects in the homicide. It was later learned that the suspect was actually Clarence Hill (whom Mr. Perry only knew by his nickname “Doodoo”), and not Clarence Carr. Mr. Perry’s father, who was very irate, came to the bureau and took ] 4his son home. Detective Rodrigue also took statements from Mr. Hill and defendant.
 

 Dr. Susan Garcia conducted the autopsy of Mr. Zerat and testified that the manner of death was homicide and the cause of death was a single, distant-range gunshot wound to his back.
 

 At trial, Alfred Perry, Jr., testified that at the time of the incident, he lived at 218 Helen Street with his father. He also testified that defendant was his cousin, and that he had known defendant since they were young. On November 7, 2007, shortly before 8:00 p.m., Mr. Perry was hanging out with his friend at his friend’s house near the corner of Helen and Fredericks Streets.
 

 At some point, Mr. Perry spoke to Mr. Leagea, while defendant and Mr. Hill were standing by the basketball goal in the middle of Helen Street. Mr. Leagea asked Mr. Perry if he wanted to get some Cisco, a type of alcohol, and Mr. Perry replied that he did. Mr. Leagea said he did not have any money to buy it, and Mr. Perry said he did not have any money either. Mr. Leagea then said, “well, let’s go rob— rob amigo,” which Mr. Perry explained was a Mexican. Mr. Perry said “no” because he “didn’t want no part of it.” He thought that defendant and Mr. Hill were close enough to hear that conversation.
 

 Afterward, Mr. Leagea, Mr. Hill, and defendant walked off, but Mr. Perry did not see exactly where they went. However, Mr. Perry did see the three of them walk in the direction of the house of the “candy lady,” who he explained sold candy and gave piano lessons. When Mr. Leag-
 
 *92
 
 ea, Mr. Hill, and defendant walked off, Mr. Perry was under the assumption that they were going to rob Mexicans for money to buy Cisco.
 

 Mr. Perry then walked towards his house, but stopped to talk to Lisa Smith, his next-door neighbor. After Ms. Smith went inside, and while Mr. Perry stood in [ ¿front of his door, Mr. Perry heard gunshots from the direction of Fredericks Street, the same direction he saw the three suspects walking towards. Mr. Perry subsequently saw Mr. Leagea, Mr. Hill, and defendant running down Helen Street toward his direction. He first saw Mr. Leagea, then Mr. Hill, and lastly, defendant. They were about 20 yards apart. As Mr. Leagea was running by Mr. Perry, he pointed a gun at Mr. Perry. Mr. Perry was scared, so he ran inside his residence. He eventually talked to the police about what he knew.
 

 Clarence Hill testified for the State at trial that on November 7, 2007, he, Mr. Leagea, and defendant were at Mr. Leag-ea’s sister’s house watching a movie. Mr. Hill said his “baby needed money for the nursery,” so they talked about robbing somebody. He admitted that the robbery was his idea. Defendant went upstairs to get a gun. When defendant came downstairs with the gun, Mr. Hill looked at it and touched it, and then gave the gun back to defendant. Defendant, in turn, gave the gun to Mr. Leagea who put it in his pocket.
 

 The three of them left and walked down Helen Street. Before they got to the end of Helen Street, they ran into Mr. Perry “right where the basketball court used to be at, by the basketball goal.” Mr. Leag-ea talked to Mr. Perry, but Mr. Hill did not overhear their conversation. While Mr. Leagea talked to Mr. Perry, defendant and Mr. Hill continued to walk. Mr. Leag-ea caught up to defendant and Mr. Hill shortly thereafter. The three of them crossed the street, and Mr. Hill observed the “Mexican” (the victim).
 

 Mr. Hill testified that they walked to the candy lady’s door as a set up, and they “played like they knocked” on her door while they were “setting the robbery up in motion.” (The candy lady lived next door to the victim.) They did not actually knock on the candy lady’s door. Mr. Hill responded affirmatively when asked if defendant was “in on that.” Mr. Hill counted to three, and they all turned |ñaround. Mr. Leagea told the victim to give him the money. The victim tried to go inside and suddenly Mr. Leagea fired two shots. The victim hollered and fell in front of the door. They did not take anything from the victim.
 

 After the shots were fired, Mr. Hill, Mr. Leagea, and defendant ran to Mr. Leag-ea’s sister’s house where they were earlier. When they got back to the house, defendant was laughing. The police came and knocked on the door, but no one talked to them. Mr. Hill left shortly thereafter, but defendant and Mr. Leagea were still there.
 

 Mr. Hill testified that Mr. Leagea’s sister threw the gun away, but Mr. Hill did not see her do that. Five days later, the police picked him up and took him to the bureau where he was advised of his rights and gave a statement. In that statement, Mr. Hill stated that defendant and Mr. Leagea were present with him during the planning and execution of the crime. On September 22, 2008, Mr. Hill entered into a plea agreement with the State which required him to testify in court.
 

 Elise Batiste testified at trial for the State that she lived at 301 Helen Street next door to the victim. She further testified that she was home when the victim got shot, and that she had just gotten in bed around 8:00 p.m. when she heard the
 
 *93
 
 shots. Ms. Batiste explained that she sold candy to children in the neighborhood, and that she typically closed at approximately 7:00 p.m. She asserted that when she closed down, she would put a sign on the door, lock the door, and go to bed, which is what she did on the night of the incident. Ms. Batiste testified that she did not hear her doorbell or a knock on her door prior to hearing the shots.
 

 Kelvin Leagea testified for the defense that on November 7, 2007, he lived at 221 Helen Street with his sister. Mr. Leagea ran into Mr. Hill that morning, and they smoked marijuana. Later in the day, they went to Mr. Leagea’s sister’s house. That night, Mr. Hill told Mr. Leagea that he needed $200.00 for his baby’s day |7care. Mr. Leagea responded that they would get it some type of way. Mr. Hill said the money for his baby’s day care was due very soon, and Mr. Leagea asked Mr. Hill what he was going to do. Mr. Hill said, “Man, we got to go jack something,” and Mr. Leagea replied, “Cool.”
 

 Mr. Leagea and Mr. Hill walked towards the candy lady’s house. Mr. Hill said, “Hold on, let’s stop right here and get this pistol.” Mr. Leagea saw Mr. Perry, and testified that defendant was there shooting baskets while Mr. Leagea was there. Mr. Leagea told Mr. Perry that he and Mr. Hill were on a “jack mission.” Mr. Leagea claimed that defendant was at the candy lady’s house by the time Mr. Leagea and Mr. Hill approached the house. Mr. Hill said, “That’s an amigo right there, we might as well get him while we got him.” Mr. Leagea responded, “Do what you got to do.”
 

 Mr. Hill told the victim to give him everything out of his pockets and said, “you already know what the deal is.” Mr. Leagea told Mr. Hill the victim was trying to run. Mr. Hill then shot the victim twice in the back. After the shooting, Mr. Hill, Mr. Leagea, and defendant ran. Mr. Leagea claimed that Mr. Hill threw the gun to him while they were running. He testified that defendant was “by the door” when everything occurred. After Mr. Hill threw the gun, Mr. Leagea caught it and ran “towards the back.” As a result of this incident, Mr. Leagea was charged with second degree murder, but pled guilty to a reduced charge and received a 40-year sentence.
 

 Mr. Leagea testified that defendant was with him and Mr. Hill at Mr. Leagea’s sister’s house before the incident, but that defendant left. Mr. Leagea also testified that defendant did not have anything to do with the robbery, that defendant did not plan it, and that defendant did not get a gun for him.
 

 | sMr. Leagea contended that on November 12, 2007, when he got inside the interview room at the bureau, JPSO Detective Jason Barrette cursed, grabbed him by the shirt, and punched him in the mouth. He further contended that Detective Barrette punched him a second time and knocked him out. Mr. Leagea also stated that Detective Barrette pointed a gun at his face and told him he had better give a statement. He said that while all of this was happening, he (Mr. Leagea) was yelling and screaming.
 

 Mr. Leagea admitted giving a statement to Detective Barrette, but claimed it was not free and voluntary, and that he did not tell the truth. He testified that he said what Detective Barrette wanted him to say, and that Detective Barrette wanted him to say that all three of them had something to do with the homicide. Mr. Leagea testified later that Detective Barrette beat him so he would say he was not involved in the homicide, and that only defendant and Mr. Hill were involved.
 

 
 *94
 
 On cross-examination, Mr. Leagea read his statement to himself, but he testified that that did not help refresh his memory and that he did not recall giving it.
 
 [2]
 
 Mr. Leagea testified that, when he gave his statement, he knew that Mr. Hill had already implicated him in the robbery. The prosecutor then read portions of Mr. Leag-ea’s statements into the record, and Mr. Leagea read his responses and answered questions.
 

 When the detective asked him during his statement what happened, Mr. Leagea replied, “They was talking about jacking amigo for their money.” Mr. Leagea claimed that “they” referred to Mr. Hill. When asked by the detective why they wanted the money, Mr. Leagea replied, “They said they wanted the money because they know they be working so hard for their money and they be getting it | 9every day and they wanted me to come along, sir.” Mr. Leag-ea again claimed that “they” referred only to Mr. Hill.
 

 Mr. Leagea told the detective in his statement that he told “them” he did not want to go and walked off and that “they” kept calling him names. Mr. Leagea also told the detective in his statement that he (Mr. Leagea) did not go to the candy lady’s house. He further told the detective in his statement that he was standing down the street the whole time while it happened. Mr. Leagea said in his statement that, “They said they were trying to rob him but he didn’t want to give it up and they shot him.” Mr. Leagea testified that he was referring to Mr. Hill and defendant in that statement, but that was not the truth.
 

 Mr. Leagea told Detective Barrette in his second statement that defendant said to him they were about to go on a mission to “jack some amigos, you coming?” Mr. Leagea testified at trial that that was not true. He admitted to the detective in that statement that he crossed the street with defendant and Mr. Hill. Mr. Leagea said in his statement that Mr. Hill and defendant must have seen the “Mexicans” and “they the guys that got good vision of them.” At trial, Mr. Leagea testified that Mr. Hill saw the “Mexicans,” and that Detective Barrette told him to say that.
 

 Mr. Leagea responded affirmatively in his statement when Detective Barrette asked him if the gun was given back to defendant and whether defendant threw it by Mr. Leagea’s sister’s fence. Mr. Leag-ea said in his statement that defendant came back and took the gun out of the trash. However, Mr. Leagea claimed at trial that he was referring to “Corey” and not “Cody,” the defendant. He also said in his statement that defendant had told him earlier that day that he (defendant) “placed” the gun at his mother’s house.
 

 | mMr. Leagea testified at trial that during the second statement, Detective Barrette had his gun on the table waiting for Mr. Leagea to “mess up,” and that the gun was cocked. During the third statement, Mr. Leagea positively identified defendant in a photographic lineup as the person on the scene who was talking about robbing someone. Mr. Leagea testified at trial that he positively identified Mr. Hill in a photographic lineup after Detective Barrette pointed to Mr. Hill’s picture.
 

 Mr. Leagea testified that he indicated in his statement that he understood his rights, was willing to make a statement and answer questions without a lawyer, and that no promises or threats had been made to him and no pressure or coercion had been used against him.
 

 Defendant, age 15 at the time of the incident, testified at trial that in November
 
 *95
 
 of 2007, he sometimes lived with his grandmother and his sister at his grandmother’s house at 216 Helen Street. On November 7, 2007, defendant went across Helen Street to Mr. Leagea’s sister’s house about 3:00 or 4:00 p.m. to watch television and to help her with the children. At some point, Mr. Hill and Mr. Leagea came over and appeared to be “high.” Mr. Hill said he needed to rob “something” to get his baby in day care.
 

 Defendant said he did not go along with that and left, and that Mr. Hill and Mr. Leagea came out of the door behind him. Defendant went to the basketball goal in the middle of the street. He saw Mr. Perry and went over briefly talk to him. Mr. Hill and Mr. Leagea came up the street behind defendant, and Mr. Leagea started talking to Mr. Perry. Defendant was not sure what they were talking about, but he knew it was something about robbing somebody. Defendant left when Mr. Leagea and Mr. Perry started talking and went to the candy lady’s house.
 

 _JjjMr. Hill and Mr. Leagea walked across the street with defendant. Mr. Hill and Mr. Leagea said, “That go the man right there to rob.” Defendant went to the candy lady’s house and knocked on her door. As defendant did so, he heard shots, but he did not see who fired them. After defendant heard the shots, Mr. Hill and Mr. Leagea ran, and defendant ran behind them. Defendant saw Mr. Leagea with a gun in his hand, so he assumed that Mr. Leagea shot the victim. The three of them ran to Mr. Leagea’s sister’s house.
 

 The police eventually arrested him and brought him to the bureau. Defendant’s mother came to the bureau shortly thereafter, and defendant gave a statement. Mr. Leagea walked in front of defendant and went through another door. Defendant subsequently heard Mr. Leagea screaming. Defendant testified that he did not have anything to do with the victim’s murder. He further testified that he did not help plan the robbery, nor did he give Mr. Hill or Mr. Leagea a gun. Defendant also stated that he did not try to rob the victim, nor did he say anything to him.
 

 Defendant testified that Mr. Leagea went upstairs and gave his sister the gun to throw away. The next morning, defendant asked Mr. Leagea’s sister if she threw it away, and she said, “Yeah.” Defendant testified that that was not his gun and that he did not own one.
 

 Defendant’s statement to the police, which was played for the jury, was similar to his trial testimony. However, in that statement, the detective said, “... and they agreed to rob somebody? And you agreed to just walk down the street with them you said?,” and defendant replied affirmatively.
 

 Kim Wright, defendant’s mother, testified that on November 12, 2007, the police came to her house and brought her to the detective bureau. She was present when the detective was questioning her son. While she was there, she heard a lot | ^of noise, including screaming and cursing, from another room. Detective Rodrigue was not rude to or rough with her or her son.
 

 Indiana Wright, defendant’s sister, testified that on November 7, 2007, she was at her grandmother’s house at 216 Helen Street where she was living. On that date, she first saw Mr. Hill and Mr. Leagea together that day around 12:00 p.m. Mr. Hill talked about needing to “hit a lick” to get his baby some Pampers. She saw that Mr. Hill had a black .38 caliber gun in his back pocket. When Ms. Wright saw that, she went to her mother-in-law’s apartment. At 7:00 or 8:00 p.m., Ms. Wright
 
 *96
 
 left to go home and walked down Freder-icks.
 

 While she was standing at the corner of Helen and Fredericks Streets, she saw Mr. Hill and Mr. Leagea crossing the street. Ms. Wright thought that Mr. Hill and Mr. Leagea were just talking to the victim at first, but then the man with the black jacket shot the victim. Ms. Wright testified that when she saw Mr. Hill and Mr. Leagea earlier that day, Mr. Hill was wearing a black jacket, and Mr. Leagea was wearing a colorful jacket. After the shooting, Ms. Wright ran to her grandmother’s house. She claimed that she did not see defendant on the scene of the shooting or anywhere else on Helen Street. Ms. Wright saw defendant when she got to Mr. Leagea’s sister’s house, and she also saw Mr. Hill and Mr. Leagea who came in after she did.
 

 Lieutenant Luis Munguia testified for the State in rebuttal regarding booking photographs of Mr. Leagea taken in connection with Mr. Leagea’s arrest on November 12, 2007 which were introduced into evidence at trial. The State later contended during closing argument that these photographs showed that Mr. Leag-ea did not have any marks on him, even though Mr. Leagea claimed that Detective Barrette punched him and knocked him out.
 

 1,
 
 ^DISCUSSION
 

 By his first assignment of error, defendant argues that the evidence was insufficient to support the verdict. He contends that the only evidence against him was the testimony of his co-defendant, Clarence Hill, who was not credible because he made an agreement with the State to testify against him in exchange for a 12-year sentence. Defendant further contends that his other co-defendant, Kelvin Leag-ea, testified at trial that defendant was not involved in the shooting. He asserts that the only reason Mr. Leagea implicated him in the shooting in his previous statement was because Detective Barrette coerced him into doing so. Defendant maintains that the State did not exclude every reasonable hypothesis of innocence.
 

 The State responds that a rational fact-finder, after viewing the evidence in the light most favorable to the prosecution, could have found beyond a reasonable doubt that defendant was guilty of manslaughter. The State further responds that the jury made a credibility determination and believed the State’s case.
 

 In reviewing the sufficiency of evidence, an appellate court must determine that the evidence, whether direct or circumstantial, or a mixture of both, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt.
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979);
 
 State v. Neal,
 
 00-0674, p. 9 (La.6/29/01), 796 So.2d 649, 657,
 
 cert. denied,
 
 535 U.S. 940, 122 S.Ct. 1323, 152 L.Ed.2d 231 (2002);
 
 State v. Lawson,
 
 08-123, p. 7 (La.App. 5 Cir. 11/12/08), 1 So.3d 516, 522.
 

 In cases involving circumstantial evidence, the trial court must instruct the jury that, “assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence.” LSA-jR.S.14 15:438. The reviewing court is not required to determine whether another possible hypothesis of innocence suggested by the defendant offers an exculpatory explanation of events. Rather, the reviewing court must determine whether the possible alternative hypothesis is sufficiently reasonable that a rational juror could not have found proof of guilt beyond a reasonable doubt.
 
 State v. Mitchell,
 
 99-3342, p.
 
 *97
 
 7 (La.10/17/00), 772 So.2d 78, 83;
 
 State v. Washington,
 
 03-1135, p. 4 (La.App. 5 Cir. 1/27/04), 866 So.2d 973, 977.
 

 In the instant ease, defendant was charged with second degree murder, but was convicted of the responsive verdict of manslaughter. LSA-R.S. 14:30.1 delineates two theories of second degree murder. The jury was charged with the second theory, which provides that second degree murder is the killing of a human being when the offender is engaged in the perpetration or attempted perpetration of armed robbery, even though he has no intent to kill or to inflict great bodily harm. LSA-R.S. 14:30.1 A(2).
 

 LSA-R.S. 14:31 delineates two theories of manslaughter. The jury was charged with the first theory, which provides that manslaughter is a homicide which would be second degree murder, but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. LSA-R.S. 14:31 A(1). Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender’s blood had actually cooled, or that an average person’s blood would have cooled, at the time the offense was committed. LSA-R.S. 14:31 A(1).
 

 “Sudden passion” and “heat of blood” are not elements of the offense of manslaughter; rather, they are mitigatory factors which may reduce the grade of the offense.
 
 State v. Johnson,
 
 01-1362, pp. 11-12 (La.App. 5 Cir. 5/29/02), 820 So.2d 604, 610,
 
 writ denied,
 
 02-2200 (La.3/14/03), 839 So.2d 32. In order to be entitled | iato the lesser verdict of manslaughter, the defendant is required to prove the mitigatory factors by a preponderance of the evidence.
 
 State v. Barbarin,
 
 04-1094, p. 10 (La.App. 5 Cir. 3/1/05), 900 So.2d 95, 101.
 

 The testimony at trial indicates that defendant did not shoot the victim. Apparently, the State’s objective was to prove that defendant was at least a principal to the murder. The record shows the jury was instructed on the law of principals. Under LSA-R.S. 14:24, “[a]ll persons concerned in the commission of a crime, whether present or absent, and whether they directly commit the act constituting the offense, aid and abet in its commission, or directly or indirectly counsel or procure another to commit the crime, are principals.” Only those persons who “knowingly participate in planning or execution of a crime” are principals to that crime.
 
 State v. Pierre,
 
 93-893, p. 4 (La.2/3/94), 631 So.2d 427, 428;
 
 State v. King,
 
 06-554, pp. 7-8 (La.App. 5 Cir. 1/16/07), 951 So.2d 384, 390,
 
 writ denied,
 
 07-371 (La.5/4/07), 956 So.2d 600.
 

 Mere presence at the scene of a crime does not make one a principal to the crime.
 
 Id.
 
 However, “[i]t is sufficient encouragement that the accomplice is standing by at the scene of the crime ready to give some aid if needed, although in such a case it is necessary that the principal actually be aware of the accomplice’s intention.”
 
 State v. Page,
 
 08-531, p. 10 (La.App. 5 Cir. 11/10/09), 28 So.3d 442, 449,
 
 writ denied,
 
 09-2684 (La.6/4/10), 38 So.3d 299,
 
 citing, State v. Anderson,
 
 97-1301, p. 3 (La.2/6/98), 707 So.2d 1223, 1225 (per curiam).
 

 When a defendant does not object to a legislatively responsive verdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged.
 
 State ex rel. Elaire v. Blackburn,
 
 424 So.2d 246, 252 (La.1982),
 
 cert. denied,
 
 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983);
 
 State v. Austin,
 
 04—993, p. 13 (La.App. 5 Cir. 3/1/05), 900 So.2d 867, 878,
 
 *98
 

 writ denied,
 
 05-0830 (La.11/28/05), 916 So.2d 143. The
 
 Blackburn
 
 court explained, at 251-52:
 

 It would be unfaii' to permit the defendant to have the advantage of the possibility that a lesser “compromise” verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object.
 

 In the instant case, the evidence presented was not sufficient under the
 
 Jackson
 
 standard to support a manslaughter conviction. There was no evidence that the homicide was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. In fact, defendant testified that the victim was not doing anything to anybody “out there” that would justify him getting shot. Defendant further testified that he had never spoken to the victim, never had any dealings with him, and that it did not look like the victim was doing anything improper or going to cause a problem for anybody. Additionally, there was no evidence of any other provocation. Nevertheless, defendant did not object in the trial court to the responsive verdict of manslaughter, nor does he do so on appeal. Accordingly, the defendant is entitled to a reversal of his conviction only if the evidence is insufficient under the
 
 Jackson
 
 standard to support a conviction of the charged offense, second degree murder.
 
 See Austin, supra.
 

 After reviewing the record and the jurisprudence, we conclude that the evidence was sufficient under the
 
 Jackson
 
 standard to support a conviction of the charged offense, second degree murder.
 

 In a case similar to the instant one,
 
 State v. Hill,
 
 98-1087 (La.App. 5 Cir. 8/31/99), 742 So.2d 690, 697,
 
 writ denied,
 
 99-2848 (La.3/24/00), 758 So.2d 147, this Court upheld defendant’s second degree murder conviction, noting that the | 17jury had found that defendant was at least a principal to the crime. In that case, defendant was at the murder scene with knowledge by his own admission that his co-defendant planned to rob the victim, and defendant remained with him. Defendant said or did nothing to prevent the crime, and he did not come to the victim’s aid after the shooting. Instead, defendant and his co-defendant fled.
 
 Id.,
 
 98-1087 at 10, 742 So.2d at 696-97.
 

 Likewise, in
 
 State v. Page, supra,
 
 a cab driver was killed. Defendant gave a statement admitting he was at the scene next to the cab, but that Junior shot the victim. Defendant stated he saw Junior retrieve a gun from the bushes, walk up to the cab driver, and ask for money. When the driver refused to give Junior money, Junior pulled the trigger. Defendant was convicted of second degree murder. On appeal, defendant contended that under the law of principals, his mere presence at the scene was insufficient to show that he had the requisite mental state, and that he aided and abetted in the murder. This Court, citing
 
 State v. Hill, supra,
 
 found that, even under the law of principals, the evidence was sufficient to support the conviction. This Court noted that, as in
 
 Hill,
 
 the defendant in
 
 Page
 
 remained with Junior at the scene, did nothing to prevent the crime, fled the scene rather than come to the victim’s aid after the shooting, and did not attempt to report the shooting. Additionally, this Court noted that defendant and Junior had been seen together on the day of the murder talking about robbing someone if they had the chance.
 
 Id.,
 
 08-531 at 5-11, 28 So.3d at 447-50.
 

 In the instant case, the State presented evidence that showed that defendant and
 
 *99
 
 Mr. Leagea were present at Mr. Leagea’s sister’s house when Mr. Hill talked about robbing someone to get money for Mr. Hill’s baby’s day care. Mr. Hill testified that defendant went upstairs to get a gun, and then gave it to Mr. Leagea. According to Mr. Hill, the three of them left and walked down Helen Street. Mr. 118Leagea saw Mr. Perry and asked him if he wanted to rob a “Mexican,” but Mr. Perry refused. While Mr. Leagea talked to Mr. Perry, defendant and Mr. Hill continued to walk. Mr. Leagea caught up to them, and the three of them crossed the street and observed the victim. The three of them then walked up to the door of the candy lady (who lived next door to the victim) and pretended like they were knocking. Mr. Hill counted to three, and they all turned around. Either Mr. Hill or Mr. Leagea told the victim to give them his money, and when the victim tried to run, either Mr. Hill or Mr. Leagea shot him. After the shooting, defendant, Mr. Hill, and Mr. Leagea ran back to Mr. Leagea’s sister’s house, where they were just before the murder.
 

 In
 
 Page,
 
 the defendant and Junior were seen together on the day of the murder talking about robbing someone, which is similar to the instant case, where Mr. Hill, Mr. Leagea, and defendant were together just before the murder talking about robbing someone. Similar to
 
 Hill
 
 and
 
 Page,
 
 the defendant in the instant case remained with Mr. Leagea and Mr. Hill at the scene, did nothing to prevent the crime, fled the scene rather than come to the victim’s aid after the shooting, and did not attempt to report the shooting.
 

 As was detailed above, the State presented evidence to the jury to show that defendant helped plan the robbery, obtained the gun that was used to commit it, and assisted in executing the crime. The defendant and his witnesses denied that defendant was involved in the planning or the executing of the crime or that he obtained the gun. Also, the jury heard testimony regarding Mr. Hill’s plea agreement with the State and Mr. Leagea’s allegations that Detective Barrette beat him so that he would implicate defendant in the crime. The jury obviously found the State’s witnesses to be more credible.
 

 | is/The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness.
 
 State v. Rowan,
 
 97-21, p. 7 (La.App. 5 Cir. 4/29/97), 694 So.2d 1052, 1056. Where there is conflicting testimony about factual matters, the resolution of which depends on a determination of credibility of the witnesses, this is a matter of the weight of the evidence, not its sufficiency.
 
 State v. White,
 
 472 So.2d 130, 132 (La.App. 5 Cir.1985). The credibility of witnesses will not be reweighed on appeal.
 
 State v. Rowan, supra.
 
 “[T]he
 
 Jackson
 
 standard does not serve as a vehicle for a reviewing court to second guess the rational credibility determinations of the fact finder at trial.”
 
 State v. Juluke,
 
 98-341, p. 4 (La.1/8/99), 725 So.2d 1291, 1293 (per curiam).
 

 In light of the foregoing, we conclude that the evidence was sufficient under the
 
 Jackson
 
 standard to support a conviction of second degree murder, and thus, a responsive verdict of manslaughter.
 
 [3]
 

 
 *100
 
 By his second assignment, defendant argues that he was denied his right to present a defense when the trial judge prevented him from asking Detective Ro-drigue why Detective Jason Barrette was no longer employed by the Jefferson Parish Sheriffs Office. Defendant contended that the jury had the right to know that Detective Barrette was dismissed from the police force because of his unprofessional conduct with individuals arrested for felony offenses, which included his history of provoking and manipulating suspects to say what he told them to say and his forcing suspects into making statements against themselves and other co-defendants. Defendant asserts that Detective Barrette coerced Kelvin 12nLeagea into making a statement that incriminated defendant and, therefore, the reasons behind Detective Barrette’s termination were relevant.
 

 The State responds that given the fact that the trial judge permitted the defense to question Mr. Leagea regarding Detective Barrette’s actions, and given that Detective Barrette did not testify at trial, defendant has failed to show the relevancy of cross-examining Detective Rodrigue regarding Detective Barrette’s termination.
 

 The record reflects that on September 17, 2008, defense counsel filed a “motion for subpoena duces tecum for production of personnel file for Jason Barrette.” In connection with that motion, the trial judge ordered the personnel records of Detective Barrette to be produced in open court on September 22, 2008. However, there is no evidence in the record that that file was ever produced or considered by the trial judge.
 

 During his opening statement at trial, defense counsel told the jury that Detective Barrette forced Mr. Leagea to give a statement by beating him. Afterward, defense counsel stated that he did not expect Detective Barrette to come to court to refute what he had said, because Detective Barrette was no longer a Jefferson Parish deputy as he had been arrested and fired. The prosecutor objected, and the trial judge told him and defense counsel to come forward. The prosecutor argued that defense counsel “cannot go there” and “cannot talk about any of that,” noting that Detective Barrette had never been convicted.
 

 Defense counsel replied that Detective Barrette had been fired and arrested, and that information had been turned over in every case in which Detective Barrette had been involved. The prosecutor responded that that information had |21been turned over because it was
 
 “Brady,”
 
 but that it was not admissible in court.
 
 [4]
 
 Defense counsel contended that he had the right to inform the jury why the State was not going to call Detective Barrette and said that he was going to ask Detective Ro-drigue about the matter. The prosecutor repeated that that evidence was inadmissible.
 

 The trial judge ruled that defense counsel’s comment regarding Detective Barrette was inflammatory, and he was going to instruct the jury to disregard it. Defense counsel noted his objection, and the prosecutor said he would instruct defense counsel not to question any witness regarding that matter. Defense counsel said he was going to, and the trial judge said they would worry about that later. The prosecutor stated that he did not want defense counsel to raise that topic again in front of the jury, and he asked the trial judge to instruct him accordingly.
 

 
 *101
 
 The trial judge again found the topic in question to be inflammatory and said he was going to instruct the jury to disregard defense counsel’s comments. The trial judge told defense counsel that he would complete his opening statement and then they would take a brief recess so the trial judge could consider this matter and make a ruling. Afterward, the trial judge instructed the jury to disregard the statement regarding Detective Barrette and told them that he had instructed defense counsel not to make that statement again.
 

 After trial began and witness Alfred Perry, Jr. completed his testimony, the trial judge said that before the jury came back in, he had considered defense counsel’s desire to question witnesses regarding the arrest of Detective Barrette. The trial judge asked the prosecutor to state the basis of his objection. The prosecutor said that evidence was irrelevant and inadmissible, and that Detective 122Barrette’s departure from the JPSO was not related to this investigation and was only meant to inflame the jury.
 

 Defense counsel replied that he was not using the fact of the arrest to impeach a witness, since that witness would not be called to testify. Rather, defense counsel said that he thought the jury needed to know that Detective Barrette was discharged from the JPSO for misconduct. The prosecutor remarked that defense counsel had the opportunity to subpoena anybody he liked.
 

 After hearing arguments of counsel, the trial judge ruled that the fact that Detective Barrette was arrested with no subsequent conviction was inadmissible. The trial judge said that if defense counsel intended to go into Detective Barrette’s “disposition from the police force,” unless that witness had direct knowledge of it, he was not going to allow that either. The prosecutor said that if Detective Barrette was fired or anything “like that,” that evidence was irrelevant and inadmissible. The trial judge responded that he would make that ruling if it came up.
 

 Later in the trial, after a recess had concluded, the trial judge said that it had been brought to his attention by counsel in chambers that defense counsel intended to ask a series of questions to a witness to which the prosecutor objected. The trial judge commented that the prosecutor wanted an instruction that defense counsel could not ask those questions along with the elicited answers, which the trial judge considered as the prosecution’s motion in limine. When the trial judge asked defense counsel what his questions were, defense counsel responded that he would rather ask them outside the presence of Detective Rodrigue. The trial judge then asked that Detective Rodrigue be taken outside.
 

 The prosecutor said he wanted the record to reflect that this issue was based on defense counsel’s reference in his opening statement (to Detective Barrette). The trial judge stated that he thought defense counsel was going to repeat the | ^questions he wanted to ask. Defense counsel said he intended to ask Detective Rodrigue about the nature of his relationship with Detective Barrette when they were in the homicide division together, and whether they shared duties in this case. Defense counsel said he was also going to ask Detective Rodrigue whether Detective Barrette still worked for the JPSO, and if he did not, then defense counsel was going to ask Detective Rodrigue whether he had personal knowledge of why Detective Barrette was no longer employed by the JPSO.
 

 When the trial judge asked the prosecutor which questions he objected to, the prosecutor replied that he objected to the last question as to whether Detective Ro-
 
 *102
 
 drigue had personal knowledge of why Detective Barrette left the JPSO, since it was irrelevant to this case. Defense counsel responded that he expected Mr. Leagea to testify that he was beaten by Detective Barrette, which caused him to give a statement. Defense counsel further responded that he needed to be able to argue that Detective Barrette was not there and why he was not there, and why the State did not call him as a witness.
 

 The trial judge said that, even if Mr. Leagea gave that type of testimony, it would go unrefuted because the State did not plan on calling the detective. The trial judge ruled that defense counsel could use that in his argument; however, he said he was going to grant the prosecution’s motion in limine as to that one question only, because he found that the probative value of the evidence on the issue of credibility was substantially outweighed by the risk of undue prejudice. As such, the trial judge ruled that he would not allow defense counsel to ask that question. When defense counsel asked the trial judge whether he could ask Detective Rodrigue if he knew why Detective Barrette was no longer employed by the JPSO, the trial judge responded negatively.
 

 1 ^Defense counsel noted his objection. The trial judge indicated that defense counsel could ask Detective Rodrigue whether Detective Barrette was presently employed with the JPSO, but not whether he knew of any reasons for Detective Barrette’s absence. Defense counsel asked the trial judge if he could ask Detective Rodrigue whether Detective Barrette was terminated from the JPSO, and the trial judge responded negatively.
 

 Defense counsel objected to the trial judge’s ruling and cited
 
 “State v. Vigi,”
 
 which he argued was a Louisiana Supreme Court case that said the right to present a defense trumped the laws of evidence. The trial judge noted defense counsel’s objection and pointed out that the information defense counsel was attempting to elicit pertained to a detective who was not even going to be called as a witness in this case. The prosecutor added that he had provided the trial judge with numerous cases on that issue.
 

 During closing argument, defense counsel commented that the State did not call Detective Barrette as a witness to refute Mr. Leagea’s allegations that he was beaten by the detective. Defense counsel said that the State did not call Detective Barrette because it would not have helped its case. As such, he argued that Mr. Leagea was being truthful about what occurred in the interview room.
 

 During rebuttal, the prosecutor contended that the State did not need Detective Barrette’s testimony in this case, as Detective Barrette did not take defendant’s statement. He noted that Detective Barrette only took Mr. Leagea’s statement and did not have anything to do with other aspects of the investigation. The prosecutor indicated that the defense could have subpoenaed Detective Barrette.
 

 The Sixth Amendment of the United States Constitution and Article I, § 16 of the Louisiana Constitution guarantee an accused in a criminal prosecution the 12*right to be confronted with the witnesses against him.
 
 State v. Carter,
 
 96-358, p. 8 (La.App. 5 Cir. 11/26/96), 685 So.2d 346, 351. The primary purpose of confrontation is to secure for the defendant the opportunity for cross-examination.
 
 Id.
 
 However, the extent of cross-examination is not without limitation. In order for evidence to be admissible at trial, it must be relevant. The determination regarding the relevancy of tendered evidence, and therefore the scope and extent of cross-examination, is within the discre
 
 *103
 
 tion of the trial judge, whose ruling will not be disturbed absent an abuse of discretion.
 
 Id.
 

 An accused also has a constitutional right to present a defense.
 
 State v. Blank,
 
 04-204, p. 49 (La.4/11/07), 955 So.2d 90, 130,
 
 cert. denied,
 
 552 U.S. 994, 128 S.Ct. 494, 169 L.Ed.2d 346 (2007). However, this right does not require a trial court to admit evidence that is irrelevant or has so little probative value that it is substantially outweighed by other legitimate considerations in the administration of justice.
 
 State v. Carter,
 
 96-358 at 9, 685 So.2d at 351. A conviction will not be overturned where the defendant does not show that he was prejudiced by a limitation of the cross-examination of a witness.
 
 State v. Ramirez,
 
 09-350, p. 14 (La.App. 5 Cir. 12/29/09), 30 So.3d 833, 843.
 

 Relevant evidence is any “evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.” LSA-C.E. art. 401. All relevant evidence is admissible, except as otherwise provided by law. LSA-C.E. art. 402. But, even relevant evidence may be excluded “if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time.” LSA-C.E. art. 403.
 

 12nIn the instant case, we find that defendant has not shown that he was prejudiced by the limitation of the cross-examination of Detective Rodrigue. Although defendant has alleged in his appellate brief that Detective Barrette was dismissed from the JPSO for forcing suspects to make false statements, testimony to that effect was not proffered for the panel’s consideration. As such, it is unclear what Detective Ro-drigue would have said had he been asked questions regarding Detective Barrette’s employment with the JPSO. Since that testimony was not proffered, we are unable to determine whether it would have been relevant and whether its probative value would have been substantially outweighed by the danger of unfair prejudice.
 

 Additionally, the trial judge did allow defense counsel to elicit testimony from Detective Rodrigue that Detective Barrette conducted the interview of Mr. Leag-ea and obtained a taped statement from him, and that Detective Barrette was no longer employed with the JPSO. Further, the trial judge also allowed defense counsel to question Mr. Leagea regarding Detective Barrette’s alleged actions. Mr. Leagea testified that Detective Barrette cursed at him, grabbed his shirt, punched him in the mouth, knocked him out, and held a gun to his head in order to obtain a statement from him. Mr. Leagea also testified that he was yelling while this was occurring. Defendant partially corroborated Mr. Leagea’s testimony when he testified that he heard Mr. Leagea screaming at the detective bureau, and defendant’s mother also partially corroborated Mr. Leagea’s testimony when she testified that she heard a lot of noise, including screaming and cursing, from another room while she was at the detective bureau. Detective Barrette was not called as a witness at trial. As such, the jury heard uncontro-verted testimony that Detective Barrette obtained the statement from Mr. Leagea by beating and threatening him.
 

 |27In light of the foregoing, we find that the trial judge did not abuse his discretion by prohibiting defense counsel from questioning Detective Rodrigue regarding the reasons why Detective Barrette was no longer employed by the Jefferson Parish Sheriffs Office.
 

 
 *104
 
 By his final assignment, defendant contends that his 25-year sentence is constitutionally excessive. He argues that the sentence should be reduced because there was no evidence that he shot the victim, and the evidence only established that he knew Mr. Hill and Mr. Leagea and was in the area when the shooting occurred. Defendant further argues that there was no definitive evidence he was actively involved in this incident other than the testimony of Mr. Hill, who entered into a plea agreement with the State for a 12-year sentence if he testified against defendant. Defendant also asserts that justice dictates that he receive the same sentence as Mr. Hill or a lesser one, since it was Mr. Hill’s idea to rob people that day based on race, and since there was testimony that it was Mr. Hill who shot the victim in the back.
 

 The State responds that the trial judge did not abuse his discretion by imposing a 25-year sentence. It contends that the sentence is not constitutionally excessive because it is not grossly disproportionate to the harm caused to the community by murder. The State further contends that the 25-year sentence is consistent with the sentences imposed on similarly situated defendants in other cases.
 

 On December 4, 2009, at the sentencing hearing, defense counsel asked the trial judge to take into account the fact that defendant had only been 15-years-old for three months when the incident occurred. He noted that if the crime had occurred three months before it did, defendant would have been in the juvenile court system where the maximum sentence he could have received would have | ^been six years, until his 21st birthday. Defense counsel asked the trial judge to have mercy on defendant because of his age, and because of the facts of this case.
 

 Defense counsel argued that defendant had nothing to do with the actual shooting. He asserted that even if the State’s evidence were true (that defendant went upstairs, got a gun, and handed it to one of his co-defendants), there was no evidence defendant did anything else. Defense counsel asked the trial judge to consider a sentence that would allow defendant to rehabilitate himself, obtain an education, and be a productive member of society. He argued that the system called out for rehabilitation for a child, especially someone as impressionable as defendant was, noting that he was completely taken advantage of by “these two older men.” Defense counsel asked the trial judge to consider a sentence of six years or less, which would be commensurate with the sentence defendant would have received in the juvenile system.
 

 The prosecutor responded that defendant had been supervised by the juvenile court system and had been in it since he was 11 years old. He stated that, upon review of defendant’s juvenile record, the trial judge would see an escalation of violence that defendant had shown and the total disrespect and disregard he had for the criminal justice system. The prosecutor noted that there were three individuals involved in the planning of the attempted robbery which led to the victim’s death, and that the victim was deprived of his life at the young age of 29 years old. He disagreed with defense counsel’s assertion that defendant had no involvement in the victim’s murder. The prosecutor reminded the trial judge that defendant provided the gun that killed the victim, and that he was directly responsible for the victim’s death and should be punished accordingly.
 

 Defense counsel responded that the evidence did not clearly show that defendant participated in the attempted armed robbery. He argued that the fact that 129the prosecutor had to offer manslaughter to one of the defendants and attempted
 
 *105
 
 armed robbery to the other defendant who said he planned the robbery, indicated that the State did not have a strong case. Defense counsel further argued that the State had to “flip” those two men to get the least culpable person, and he hoped the trial judge would take that into consideration.
 

 The trial judge told defendant to stand up. He stated that if the jury had found him guilty of the crime he was charged with, second degree murder, defendant would have been sentenced to life in prison. The trial judge pointed out that the jury found defendant guilty of the lesser included charge of manslaughter which carried a sentencing range of zero to 40 years. The trial judge said he agreed with the jury’s verdict that defendant participated in the crime. He stated that it was probably a foolish thing to do, and he sentenced defendant to 25 years at hard labor in the Department of Corrections. Defense counsel noted his intent to appeal the jury’s verdict, and his intent to file a motion to reconsider the sentence and a request for a hearing date.
 

 On December 9, 2009, defendant filed a timely motion to reconsider sentence. In that motion, defendant moved the trial court to reconsider the sentence imposed, stating that the motion was being made due to the excessive and harsh nature of the sentence and due to the fact that the trial court failed to take into consideration LSA-C.Cr.P. art. 894.1.
 

 On March 4, 2010, at the hearing on the motion to reconsider sentence, defense counsel said his motion spoke for itself, but he asked the trial judge to consider his previous arguments regarding defendant’s age. Defense counsel said he was not asking the trial judge to change the 25-year sentence, but he was asking the trial judge to consider splitting his sentence. The trial judge asked defense counsel to explain what he meant. Defense counsel replied that he was asking forj^the sentence to be 10 years’ incarceration with 15 years suspended, which would mean that defendant would serve 85 percent of the 10 years or eight-and-a-half years. He noted that defendant would be 24 years old when he was released from jail and would be on probation for five years and have 15 years “hanging over his head” if he violated his probation.
 

 The prosecutor responded that defendant participated in attempting to rob the victim who was shot and killed. He further responded that the sentence suggested by defense counsel was illegal because manslaughter was a crime of violence, and according to LSA-C.Cr.P. art. 893, the court could not suspend the sentence of any conviction for a crime of violence.
 
 [5]
 
 The prosecutor said that he had provided the trial judge with the juvenile case file on defendant, which he knew the trial judge had reviewed. He said that the file showed that defendant had been in the criminal justice system since he was 12 years old, and that he was a “Code 6” juvenile offender.
 

 The prosecutor argued that the juvenile history showed an escalation of violence that started at age 12, which involved getting in fights at school with school personnel, bus drivers, and teachers. He further argued that the history showed an escalating history of drug abuse and then more serious violent crimes, which he explained was why the State chose to try him as an adult in the instant case. The prosecutor reminded the trial judge that defendant provided the weapon that was used to kill the victim. He noted that the trial judge
 
 *106
 
 had sentenced the co-defendant (Hill) to 25 years for manslaughter. The prosecutor argued that the trial judge had been lenient with defendant, considering that defendant got the same 25-year sentence as Mr. Hill, even though defendant showed no remorse and never |31 admitted his involvement in this case. He asked the trial judge to deny the motion. to reconsider sentence.
 

 The trial judge asked the prosecutor whether he had the authority to reduce the 25-year sentence, and the prosecutor replied affirmatively. Defense counsel again argued that the trial judge could suspend the sentence for manslaughter because the manslaughter statute did not forbid it. The trial judge took a recess to consider the matter. Afterward, the trial judge said he had reviewed the matter and agreed with the prosecutor’s interpretation of LSA-C.Cr.P. art. 893, i.e., that he did not have the authority to suspend the sentence of a conviction for a crime of violence, which included manslaughter.
 

 The trial judge commented that manslaughter was a deadly, serious crime and that it resulted in the death of an innocent victim who did nothing to provoke the incidents that led to his death. He stated that the jury had found that defendant was an integral part of those incidents. He found that the 25-year sentence was appropriate considering defendant’s “very sordid sad” background. The trial judge noted that defendant still had the incentive to turn his life around because he was eligible for parole. For those reasons, the trial judge denied the motion to reconsider sentence.
 

 The Eighth Amendment to the United States Constitution and Article I, § 20 of the Louisiana Constitution prohibit the imposition of excessive punishment. Although a sentence is within statutory limits, it can be reviewed for constitutional excessiveness.
 
 State v. Smith,
 
 01-2574, p. 6 (La.1/14/03), 839 So.2d 1, 4. A sentence is considered excessive if it is grossly disproportionate to the offense or imposes needless and purposeless pain and suffering.
 
 Id.
 
 A sentence is grossly disproportionate if, when the crime and punishment are considered in light of the |S2harm done to society, it shocks the sense of justice.
 
 State v. Lawson,
 
 04-334, p. 6 (La.App. 5 Cir. 9/28/04), 885 So.2d 618, 622.
 

 A trial judge has broad discretion when imposing a sentence and a reviewing court may not set a sentence aside absent a manifest abuse of discretion. The issue on appeal is whether the trial court abused its discretion, not whether another sentence might have been more appropriate.
 
 State v. Dorsey,
 
 07-67, p. 5 (La.App. 5 Cir. 5/29/07), 960 So.2d 1127, 1130.
 

 LSA-C.Cr.P. art. 894.1 C requires the trial judge to state for the record the considerations taken into account and the factual basis when imposing the sentence.
 
 [6]
 
 However, when there is an adequate factual basis for the sentence contained in the record, the trial court’s failure to articulate every circumstance listed in LSA-C.Cr.P. art. 894.1 does not require a remand for resentencing.
 
 State v. Sanders,
 
 98-855, p. 5 (La.App. 5 Cir. 5/19/99), 734 So.2d 1276, 1279,
 
 writ denied,
 
 99-1980 (La.1/7/00), 752 So.2d 175. In reviewing a trial court’s sentencing discretion, three factors are considered: 1) the nature of the crime; 2) the nature and background of the offender; and 3) the sentence imposed for similar crimes by the same court and other courts.
 
 State v. Pearson,
 
 07-
 
 *107
 
 332, p. 15-16 (La.App. 5 Cir. 12/27/07), 975 So.2d 646, 656.
 

 Defendant was charged with second degree murder but convicted of the responsive verdict of manslaughter. Whoever commits manslaughter shall be imprisoned at hard labor for not more than 40 years. LSA-R.S. 14:31 B.
 

 In a case similar to the instant one,
 
 State v. Williams,
 
 34,359 (La.App. 2 Cir. 5/9/01), 786 So.2d 203,
 
 writ denied,
 
 01-2275 (La.5/10/02), 815 So.2d 835, defendant was originally charged as a principal to a second degree murder which occurred during the course of an armed robbery. However, he was found guilty of [aathe responsive verdict of manslaughter after a jury trial. The trial court sentenced defendant to 30 years at hard labor. On appeal, defendant argued that his 30-year sentence was excessive, noting that the trial court failed to give adequate weight to various factors, including his youth at the time of the offense, his lack of a felony record, the fact that his co-defendant was the leader/organizer of the robbery and the shooter, and the minimal evidence linking him to this crime.
 
 Id.,
 
 34,359 at 20, 786 So.2d at 216.
 

 The appellate court found that the 30-year sentence was not excessive. The court found that although defendant was only 16 at time of the offense and was the least culpable of the offenders, defendant had a significant juvenile criminal history, and he did not receive the maximum 40-year sentence. Further, the appellate court noted that although defendant denied any participation in the crimes, that claim was refuted by the evidence. The court stated that defendant was present at the planning of the robbery and during the commission of the robbery-homicide, and that he received part of the robbery proceeds. The appellate court also stated that defendant received great lenience from the jury in light of the overwhelming evidence showing his guilt on the charged offenses of second degree murder and armed robbery. It concluded that the 30-year sentence did not shock the sense of justice when considered in light of the violent crimes committed.
 
 State v. Williams,
 
 34,359 at 22-23, 786 So.2d at 217-18.
 

 Likewise, in
 
 State v. Bowman,
 
 95-667 (La.App. 4 Cir. 7/10/96), 677 So.2d 1094,
 
 writ denied,
 
 96-2070 (La.1/31/97), 687 So.2d 400, defendant was indicted for second degree murder, but a jury convicted him of manslaughter. He was sentenced to 33 years at hard labor. On appeal, defendant contended his sentence was excessive, arguing that he was only 16 years old at the time of the crime and that he was a first offender but received a sentence of only seven years less than [a4the maximum.
 
 Id.,
 
 95-667 at 14, 677 So.2d at 1101. Defendant further asserted that he was not the individual who did the shooting and that there was no evidence that he knew his co-defendant was going to shoot or kill the victim.
 
 Id.
 
 The appellate court found that the trial court did not abuse its discretion in sentencing, noting that the defendant was a principal to a drive-by shooting that resulted in the death of one person, and that the shooting occurred without any provocation.
 
 Id.,
 
 95-667 at 16, 677 So.2d at 1102.
 

 In the instant case, we find that the trial judge did not abuse his discretion in imposing a 25-year sentence. We find that the trial judge gave a sufficient basis for the sentence, and the sentence is supported by the record. The evidence showed that defendant was present during the planning of the armed robbery, and that he provided the gun that was used to kill the victim, pretended to knock on the next-door neighbor’s door as a set-up to the armed robbery, was present at the scene in the event the co-defendants need
 
 *108
 
 ed his assistance, and ran back to the house with his co-defendants after the shooting, the same place where the robbery was planned. Further, the evidence showed that the victim did nothing to warrant being killed.
 

 Moreover, the evidence at trial supported a verdict of second degree murder, which carries a mandatory life sentence. LSA-R.S. 14:30.1. Additionally, defendant apparently had a history of juvenile offenses that showed an escalation of violence. Lastly, it is not beyond the range of sentences other Louisiana courts have approved under similar facts.
 

 Defendant also argues that his 25-year sentence is excessive because Mr. Hill received a 12-year sentence; however, we find that this argument is moot since, according to the prosecutor at the hearing on the motion to reconsider sentence, the trial judge sentenced the co-defendant, Mr. Hill, to 25 years. ^Nevertheless, even if Mr. Hill had received a lighter sentence, the Louisiana Supreme Court has held that the fact that a co-defendant has received a more lenient sentence does not necessarily indicate that the penalty imposed on the defendant is excessive.
 
 State v. Weary,
 
 03-3067, p. 42 (La.4/24/06), 931 So.2d 297, 324,
 
 cert. denied,
 
 549 U.S. 1062, 127 S.Ct. 682, 166 L.Ed.2d 531 (2006).
 

 Additionally, the prosecutor explained to the jury during his closing argument that a plea agreement was offered to Mr. Hill after careful evaluation of the case. He told the jury that he had recommended a sentence of 12½ to 25 years for Mr. Hill, but that it was up to the trial judge who could sentence him from zero to 49½ years (for attempted armed robbery).
 
 [7]
 
 The prosecutor further explained that when Mr. Hill was arrested, he told the police what happened and did not try to distance himself from the events. Also, the prosecutor stated that the plea agreement with Mr. Hill helped them to convict Mr. Leag-ea and put him in jail for 40 years, and it assisted the State in getting both Mr. Leagea and defendant “off the streets” of Jefferson Parish.
 

 Under these circumstances, we find that the trial judge did not abuse his discretion by imposing a 25-year sentence.
 

 ERRORS PATENT
 

 The record was reviewed for errors patent, according to LSA-C.Cr.P. art. 920;
 
 State v. Oliveaux,
 
 312 So.2d 337 (La.1975); and
 
 State v. Weiland,
 
 556 So.2d 175 (La.App. 5 Cir.1990). The review reveals no errors requiring corrective action.
 

 DECREE
 

 For the foregoing reasons, defendant’s conviction and sentence are affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Co-defendants, Clarence Hill and Kelvin Leagea, were also indicted on that same date with the second degree murder of Rolando Zerat; however, this appeal pertains solely to Cody Wright. On March 10, 2009, the State amended the indictment to charge Kelvin Leagea with manslaughter in violation of LSA-R.S. 14:31. On September 28, 2009, the State amended the indictment to charge Clarence Hill with attempted armed robbery in violation of LSA-R.S. 14:64; 14:27.
 

 [2]
 

 . Mr. Leagea's three statements were not admitted into evidence.
 

 [3]
 

 .
 
 See State v. Prince,
 
 520 So.2d 778 (La.App. 3 Cir.1987),
 
 writ denied,
 
 522 So.2d 567 (La.1988). In that case, defendant was charged with second degree murder and convicted of manslaughter, even though defendant contended that the evidence was insufficient to show sudden passion, provocation, or heat of blood. The Third Circuit found that the evidence was sufficient to support a conviction for second degree murder, and that the verdict of manslaughter operated as a compro
 
 *100
 
 mise between guilty of second degree murder and not guilty.
 
 Id.
 
 at 783-85.
 

 [4]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [5]
 

 . It is noted that LSA-C.Cr.P. art. 893 was amended in 2010 by the Louisiana Legislature; however, those amendments do not affect the analysis of the issues herein.
 

 [6]
 

 . LSA-C.Cr.P. art. 894.1 was amended by the Louisiana Legislature during the 2010 Regular Session; however, those amendments do not change the analysis herein.
 

 [7]
 

 . The plea agreement is contained in the record and corroborates the prosecutor’s statement on dais point.