STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

KA 22-310


STATE OF LOUISIANA

VERSUS

TYLER NICHOLAS BENOIT



**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. CR-163581
HONORABLE MARILYN CARR CASTLE, DISTRICT JUDGE

**********

**BILLY HOWARD EZELL**
**JUDGE**

**********

Court composed of Elizabeth A. Pickett, Billy Howard Ezell, and D. Kent Savoie, Judges.


**CONVICTION FOR MANSLAUGHTER AFFIRMED; SENTENCE FOR OBSTRUCTION OF JUSTICE AFFIRMED; SENTENCE FOR MANSLAUGHTER VACATED AND SET ASIDE AND REMANDED FOR RESENTENCING.**

**Donald Dale Landry**
**District Attorney**
**Kenneth P. Hebert**
**Assistant District Attorney**
**Fifteenth Judicial District Court**
**P. O. Box 3306**
**Lafayette, LA 70501**
**(337) 232-5170**
**COUNSEL FOR:**
       **State of Louisiana**

**Douglas Lee Harville**
**Louisiana Appellate Project**
**P. O. Box 52988**
**Shreveport, LA 71135**
**(318) 222-1700**
**COUNSEL FOR DEFENDANT:**
       **Tyler Nicholas Benoit**

**EZELL, Judge.**

Defendant, Tyler Nicholas Benoit, was charged by indictment filed on October 11, 2017, with second degree murder, a violation of La.R.S. 14:30.1. A bill of information adding the charge of obstruction of justice, a violation of La.R.S. 14:130.1(A)(1), was filed on June 7, 2018. Jury selection commenced on October 11, 2021, and the jury returned a unanimous verdict finding Defendant guilty of manslaughter, a violation of La.R.S. 14:31, and obstruction of justice on October 15, 2021. On February 24, 2022, Defendant was sentenced to serve forty years at hard labor for manslaughter and to twenty years at hard labor for obstruction of justice, to run concurrently. A motion to reconsider sentence was filed on March 3, 2022, and was subsequently denied. A motion for appeal and designation of record was filed on March 10, 2022.

Defendant is now before this court asserting the State failed to prove his guilt beyond a reasonable doubt and that his sentences are excessive. We find Defendant's conviction for manslaughter and the sentence for obstruction of justice should be affirmed.

## FACTS

On August 12, 2017, Defendant and several of his friends, Bryan Eddington, Angel Hebert, Gavin White, and Devin White, went to Grant Street Dance Hall in Lafayette. After leaving the bar, Bryan and Angel got into an argument, and Angel was pushed to the ground. The victim, Christon Chaisson, intervened on Angel's behalf. A fight involving Defendant, Bryan, Gavin, and Christon then began. Defendant shot Christon in the lower right flank and subsequently disposed of the firearm. Christon died as a result of his injuries.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. We find there are no errors patent.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, Defendant contends eyewitness testimony from neutral and interested witnesses was internally inconsistent, and that police interrogation techniques and questioning altered witness statements. Thus, the State failed to prove his guilt beyond a reasonable doubt.

> "In reviewing the sufficiency of the evidence to support a conviction, an appellate court in Louisiana is controlled by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). . . . [T]he appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." *State v. Captville*, 448 So.2d 676, 678 (La.1984). . . .
>
> . . . .
>
> As a general matter, when the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the state is required to negate any reasonable probability of misidentification. *State v. Smith*, 430 So.2d 31, 45 (La.1983); *State v. Brady*, 414 So.2d 364, 365 (La.1982); *State v. Long*, 408 So.2d 1221, 1227 (La.1982). However, positive identification by only one witness is sufficient to support a conviction. *See State v. Mussall*, 523 So.2d 1305, 1311 (La.1988) (generally, one witness's positive identification is sufficient to support the conviction); *State v. Ford*, 28,724 (La.App.2d Cir.10/30/96), 682 So.2d 847, 849–50, *writ denied*, 99–0210 (La.5/14/99), 745 So.2d 12. . . . The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the "fact finder's discretion only to the extent necessary to guarantee the fundamental due process of law." *Mussall*, 523 So.2d at 1310 (La.1988).

*State v. Neal*, 00-674, pp. 9–11 (La. 6/29/01), 796 So.2d 649, 657–58, (alterations in original), *cert. denied*, 535 U.S. 940, 122 S.Ct. 1323 (2002).

2

Lieutenant William Gavin White testified he reported to the scene and had a body-worn camera. According to Lieutenant White, Gavin was questioned about where his brother, Devin, was and what he was driving. Lieutenant White testified that a female indicated she saw an individual run and get into a dark Tahoe, and that individual was associated with Gavin. Gavin said Devin left in a dark Tahoe. Therefore, Louisiana State Police put out a "be-on-the-lookout alert (BOLO)" for the vehicle, and Lieutenant White contacted the Vermillion Parish Sheriff's Office and the Kaplan Police Department to inquire about the vehicle. Lieutenant White never listed Gavin as a suspect. However, Devin was a suspect. Upon looking closely at the bodycam footage, it appeared to Lieutenant White that Gavin had hair down to his shoulders.

In the body-worn camera footage, there was discussion regarding several vehicles, including a dark Tahoe. According to a police officer seen in the video, a female reported the suspect was with the man detained by police (Gavin), and that the suspect left in a black SUV. Police further stated the detainee's brother left in a black SUV. The suspect was a male who had longer hair and "sort of a beard" and wore a white shirt. According to Gavin, his brother left in a black SUV.

Lieutenant Robinson Olivero also had a body-worn camera. A man and woman are seen on the footage. Both indicated there was a fight. However, neither of them saw who shot the victim, and they did not know the victim.

Sergeant Todd Borel was assigned to interview two witnesses, Angel Hebert and Bryan Eddington. Bryan's interview was played for the jury. Bryan was Angel's boyfriend. Bryan was informed by Sergeant Borel that Angel had reported what occurred between the two of them. Bryan told Sergeant Borel that he and Angel got into a fight inside the club. When they left, someone was hit with a beer

3

bottle. Angel then went back into the bar. Bryan walked with Gavin but then left. Gavin subsequently called Bryan, requesting that he return. Bryan met Gavin in the parking lot where the offense occurred. Angel and Bryan started arguing again, and Bryan turned to walk away when Angel grabbed the back of his shirt. Bryan pushed Angel, and she fell. Christon tried to help Angel get up and told Bryan and Gavin to get away. Bryan stated that he, Gavin, and Angel subsequently fought with Christon. Someone pushed Bryan twice, he lost his phone, and he was looking for it when he heard a gunshot. He did not know who fired the shot.

Sergeant Borel then told Bryan that police knew who shot Christon and that police had that person in custody. Thus, Bryan should not leave anything out. Bryan again indicated he did not know who the shooter was and only remembered Angel and Gavin being present. Sergeant Borel told Bryan he was not being a very good witness. Bryan then reported that "before that," Defendant, Gavin, and Devin argued over something. Bryan reiterated he did not know who shot the victim. Sergeant Borel then stated he knew who fired the shot, but he would not tell Bryan. Bryan then stated he thought it was Defendant who fired the shot. Bryan reported that Defendant got hit by a beer bottle and was drunk. Bryan then said he did not know if Defendant had a gun. He stated Devin, Gavin, and Defendant were arguing among themselves then Gavin came over to Bryan. Sergeant Borel subsequently asked Bryan who was going to raise his four-month-old son while he was in prison and told Bryan he was not being honest. Bryan then stated he was "pretty sure" Defendant fired the shot. He then stated he was "pretty positive." Bryan thought it was Defendant because Defendant was angry, had gotten hit by a beer bottle, and was drunk. Bryan then said he assumed it was

4

Defendant because Defendant was so angry. Bryan told police he had never seen Defendant that angry.

Sergeant Borel told Bryan there were cameras in the parking lot. Sergeant Borel then informed Bryan that covering for someone could lead to being charged as an accessory. Next, Sergeant Borel said he could tell Bryan was not being completely honest. Thereafter, Bryan reported a big fight broke out with Angel, Gavin, Christon, and himself. Defendant was there, and they all got slammed against the car. Bryan then said Defendant "shot that dude," and he saw Defendant do it with a black pistol. Afterward, Defendant ran. Bryan last saw Devin after the fight in the parking lot, but believed Devin left before the shooting. He later reiterated he did not see Devin during the pushing and shoving.

Sergeant Borel testified that he did not provide the name Tyler Benoit during the interview, Bryan did. Sergeant Borel did not know that name prior to his interview with Angel.

Bryan testified that he was friends with Defendant, Gavin, and Devin. Bryan said a group of his friends went to a bar and were asked to leave because Defendant got hit with a beer bottle. He subsequently pushed Angel's hands off him when he turned around, and she fell. He saw Defendant and Devin by the Tahoe but did not remember if Defendant, Gavin, and Devin got into an argument by the Tahoe. While Angel was on the ground and Bryan was trying to help her up, a man walked up, pushed Bryan away, and said he saw what Bryan did. At some point Gavin walked over. Next, a big argument involving Bryan, Christon, Angel, and Gavin occurred. Bryan testified, "[W]e was [sic] trying to calm him down and stop the arguments and go home. But he wouldn't let Angel leave with me." Bryan was pushed against a car, and Bryan hit Christon. Bryan then dropped

5

his phone and turned to look for it, when the shooting happened. Bryan was questioned about Defendant as follows:

Q. Where was Tyler?

A. I don't know.

Q. Did you see Tyler around that time, at all?

A. No. I seen [sic] Tyler after everything happened.

Q. You saw Tyler after everything had happened.

A. (No response).

Q. When's the last time you remember seeing Tyler before the shooting?

A. By the Tahoe.

Q. So tell me all that you can remember about Tyler that night in that parking lot.

A. (No response).

Q. Tell me what you remember about Tyler.

A. I thought Tyler left with Devin.

Q. Did you talk to Tyler, at all, in that parking lot?

A. No. I don't believe so.

Bryan admitted he told police that Defendant shot Christon. However, he testified that was not the truth. Bryan said he was pressured because police told him he would not raise his newborn son. Bryan then stated he gave Defendant's name because he knew Defendant owned a handgun.

Bryan testified he did not see Devin during the pushing, and he did not see the Tahoe drive off. He remembered telling police he had never seen Defendant that angry before. However, he did not recall saying he saw Defendant, Devin, and

6

Gavin in an argument. He then denied Defendant was involved in a scuffle in the bar.

According to Bryan's statement to police, Devin wore a white shirt and jeans that night and was driving a dark, black Tahoe. Bryan testified that he did not believe Devin was involved in any of the altercations that night.

On cross-examination, Bryan was questioned about threats by police:

Q.    Before you were threatened by Detective Borel, you told him that you didn't see Tyler Benoit with a gun?

A.    (Nodded head "Yes").

Q.    Right?

A.    Yes.

Q.    As far as you know, he didn't even own a gun, is what you said.

A.    Yeah.

Q.    And, also, you indicated - -

A.    Well - -

Q.    - - you didn't see him shoot anybody. Right?

A.    Yes.

Q.    And, then, you were threatened. Right?

A.    Yes.

Q.    Now, tell me about how you felt when you were threatened by Detective Borel.

A.    I was nervous, scared.

Q.    What did - - Tell me what threats he gave to you, specifically, that scared you.

A.    That I wasn't going to see my son.

Q.    He told you - -

A.     Somebody else was going to raise him.

Q.     Yeah. He told you somebody else was going to be your son's dad. Right?

A.     Yep .

       . . . .

Q.     Okay. I think he also told you you might go to jail.

A.     Yeah.

Q.     He told you you might be a suspect.

A.     Yeah.

Q.     Right? All those things scared you?

A.     Yep.

Q.     Is that why you changed your story?

A.     Yep.

Q.     The first part of the story - - your statement - - before you were threatened, was the truth. Right?

A.     Yes, sir.

Q.     You're under oath, right now, right?

A.     Yes, sir.

Q.     Are you telling me the truth?

A.     Yes, sir.

Q.     Tyler Benoit did not do this shooting.

A.     Yes, sir.

Q.     Is that correct?

A.     Not that - - I don't - - Not that I know of.

Q.     Okay. You didn't even see Tyler Benoit with a gun. Right?

A.     No, sir.

8

Sergeant Borel interviewed Angel before Bryan. His report indicated Angel did not know if the victim was involved in the fight because the victim was talking to her. She also indicated Gavin was involved in the fight, and Bryan got pushed. She did not say Defendant was involved in the fight.

The interview of Angel was published to the jury. According to her, Bryan's friends, including Defendant, were involved in a fight in the club and got kicked out.[1] Defendant was hit during the fight. Gavin left also but was not involved in the fight. Bryan followed them and was upset that Angel went back into the club. The two ended up arguing. Angel said she was pushed and fell. The victim and a girl helped her up. The victim told Bryan not to touch Angel. A group came out of nowhere and were fighting, and she did not know who it was. Angel then stated that Bryan got involved and was pushed. The victim asked Angel for her phone because he was going to call her friend to pick her up. As Angel got her phone, shots were fired, and the victim fell. She did not see who fired the shots. It sounded like it was far away. Angel indicated Bryan, Gavin, the victim, and a girl had been trying to help her.

At that time, the officer conducting the interview told Angel she needed to be honest because she could be charged later, and she knew more than what she was reporting. The officer asked Angel who would take care of her kids if she went to prison and told her she was leaving out details of what occurred. Angel then admitted that Bryan pushed her, and the victim saw it. The victim pushed both Bryan and Gavin. When Gavin was pushed, a fight broke out. Angel was not sure if the victim was involved in the fight. The officer told her that police knew who fired the shot, and Angel said she did not know who did. Angel stated she did

---

[1]Angel identified Bryan's friend as Tyler, and she did not know his last name.

9

not see Devin where the incident occurred. Devin wore a white shirt and jeans at that time.

Sergeant Benjamin Suire went to Devin's residence shortly after the shooting, and the Vermillion Parish Sheriff's Department was already there. When police arrived, Devin was speaking to his mother in the shed/building behind their home. Devin agreed to speak to Lafayette police. Devin's dark colored SUV and the outbuilding where he was located were both secured. Permission to search was granted by Devin's father, who owned the vehicle. Nothing relevant was located.

Sergeant Suire interviewed Defendant. Defendant described the incident involving Bryan and Angel. He then admitted he was in an altercation that involved pushing. Defendant said he got pushed and tried to run away. After that, his uncle picked him up, and he went to his uncle's house. He told police that no one else left with him. Defendant was asked if he knew most of his friends named him as the shooter. Sergeant Suire then asked, "[W]hat happened with that?" Defendant responded, "I guess I got scared. I never seen [sic] myself doing something like that. That's not me at all. I guess being there were so many more people than us, I just when, after somebody tried to hit me I reacted. It just happened." "It wasn't like I like oh I'm trying to rob you . . . oh or I just want to kill you. No, not at all." Defendant then stated he threw the gun, which was a 9-millimeter Taurus, in the river somewhere.[2] Defendant mentioned self-defense. He then stated, "I fucked up the rest of my life for this stupid shit."

---

[2]Steven Richardson, an expert in firearms identification, testified the shell casing found at the scene was fired from a 9-millimeter, and bullet fragments recovered from the victim were consistent with a 9 millimeter Luger ARX copper polymer bullet.

Defendant reported the gun had been in Gavin's Tahoe, and he did not understand how he got the gun during the altercation. Defendant cried after being told he was charged with second degree murder, and the charges were serious because someone died. According to Defendant, he wore jeans and a short-sleeved, gray shirt to the bar.

Sergeant Suire testified that he left the interview room, and Detective Maldonado advised he was going to speak to Defendant.[3] Sergeant Suire spoke to Defendant again on August 16, 2017. There was an attempt to clarify where Defendant disposed of the gun. However, no gun was ever found.

When Sergeant Suire told Defendant his friends indicated he was the shooter, Sergeant Suire did not know who had in fact identified Defendant. Sergeant Suire acknowledged that Defendant never specifically stated he pulled a gun and shot Christon.

Detective Norman Maldonado discussed what Gavin wore that night, indicating he was clad in a black shirt, blue jeans, and ball cap, and stated he had approximately shoulder length, dark brown hair. Gavin had informed police there was an altercation, a shot was fired, and his brother drove off in a dark SUV and left him at the scene. He said Gavin "kind of" matched the description of the shooter. Police were looking for Devin, and Gavin called Devin and told him police needed to speak to him.

Detective Maldonado prepared a photographic lineup to present to Russell Dugas and Blair Blanchard. The two had been sitting on the tailgate of Dugas' truck at the time of the offense and were not "connected to the group." Gavin was included in the line-up. Dugas selected Gavin from the lineup at 4:02 a.m. on

---

[3]When Sergeant Suire left the interview room, he did not turn off the recording system.

August 12, 2017, as the suspect. Blanchard also picked Gavin. Detective Maldonado was given information that led him to prepare another photographic lineup, and this lineup included a photo of Defendant. Blanchard stared at a photo in the second lineup, which occurred at 6:11 a.m., but indicated she did not see the suspect. Dugas selected Defendant at 6:50 a.m.

Detective Maldonado was asked about State's Exhibit 23 video footage from Reve Coffee Shop on the date of the offense. While viewing the footage, Detective Maldonado testified that Gavin was wearing a black shirt, a black hat, and jeans and had long, black hair. He had on the same clothes when he was interviewed by police. Devin wore a long-sleeved, white t-shirt, jeans, and white shoes on the video. Moreover, Devin wore a long, white shirt when he was interviewed by police. Detective Maldonado also identified Defendant as wearing a white shirt and jeans. Blanchard was seen walking by in a white shirt. Additional footage from Reve showed the group at the intersection near the bar, and individuals were identified by Detective Maldonado. Detective Maldonado testified the dark SUV left the lot at 1:25:48.

Detective Maldonado was questioned about a "10-minute dead space on the video" of Defendant's interview.[4] Detective Maldonado believed his interview was captured on video. He described his interview as follows:

> A. Yes. Basically, in summary, he explained that he had gone downtown and that - - I asked him about the shooting. Basically, I asked him, did you shoot Christon Chaisson. And he said he had got into a fight, and he pulled his - - pulled his gun out from his waist and . . .

---

[4]This occurred during a thunderstorm and power failure. Thus, the CD of the interview could not be viewed until the data thereon was extracted by the FBI.

And I said, and you what. And he said, I shot. I said, you shot? (Demonstrating).

. . . .

THE WITNESS: Okay. I have, in my report, that I spoke to Mr. Benoit. I asked Mr. Benoit if he shot the victim. Mr. Benoit stated he pulled the gun from his waistband and pulled the trigger. Mr. Benoit advised that he was surrounded by people and felt scared.

At first, Defendant stated he did not know where he got the gun from. He then said he got it from Devin's vehicle and that he had brought it with him. Defendant advised the gun was in a waterway.

On cross-examination, Detective Maldonado testified regarding Defendant's statement:

Q. All right. Yesterday, you said he shot. Is that what you're referring to?

A. Yes.

Q. Okay.

A. Yes. He shot, yes.

Q. But he didn't say anything like, I - - I shot Mr. Chaisson. He just said he shot. Right?

A. When - - He didn't say that, but my question prior - - prior to that, was, I asked Mr. Benoit if he shot the victim. To which, then, he said - - he stated that he pulled a gun from his waistband and pulled the trigger.

Detective Maldonado testified that Bryan was not investigated as the shooter. Although Blanchard identified Gavin as the shooter or said the shooter had long hair, the first suspect was Devin, who left in a dark SUV. Detective Maldonado then testified, "[A]s we saw in the video, yesterday, that dark SUV left prior to the shooting." He subsequently stated, the totality of the circumstances

13

indicated that Devin's SUV left before the shooting. Detective Maldonado reiterated that Devin left the scene and was located in a shed talking to his mother.

Detective Maldonado was asked about the lineups:

Q.      Okay. Detective Maldonado, if you would, show me the long-haired shaggy guy up there, with hair down to his shoulders.

. . . .

A.      I believe the question was to show you the shaggy-haired or the long-haired? I'm sorry?

Q.      The -- Down to his shoulders. Yeah. Which one?

A.      Neither one of them.

Q.      Now, you were able -- You interviewed Gavin the night of the shooting, didn't you?

A.      That is correct.

Q.      I think you testified to that, earlier. Did he look like that (indicating)?

A.      No, ma'am. No, ma'am, he didn't.

Q.      Was his hair anything like this, other than the color?

. . . .

        THE WITNESS:   No, ma'am.

. . . .

Q.      Was it - - Was his hair like this (indicating)?

A.      No, ma'am.

Q.      How was it different?

A.      At the time of that night, it was long and to his shoulders, as we saw in the video.

Q.      Okay. So the black-shirt guy, with the baseball cap backwards, and the hair down to here (indicating), that was Gavin on the night of the shooting?

14

A. That is correct.

Q. Okay. So he didn't look like this (indicating).

A. No.

Q. Now, looking at Tyler Benoit, how was - - Did he look like that (indicating)?

A. Well, the beard is - - was a little bit more prominent. The hair was longer and more shaggy and out past the ears, coming down.

Q. Okay. But not as long as Gavin's? Is that fair to say?

A. Correct.

Detective Maldonado did not have a discussion with Blanchard regarding the identification of Gavin, and she did not tell him Gavin was the shooter. At some point, he was aware she said someone named Tyler was the shooter.

According to Detective Maldonado, police did not interview the other people assisting Angel at the scene, as they never came forward.

Gavin testified regarding events leading up to the offense. His interview with police was played for the jury. Gavin told police he went with Devin to Grant Street Dancehall but was going to leave with Bryan. Defendant argued with Devin right before they left. Defendant wanted to leave with Devin, but Devin did not want him to. Gavin did not know who Defendant left with. Devin was driving a dark SUV. Bryan and Angel got into an argument, and the victim approached them. Gavin walked up and said he would calm them down. The victim got aggressive with Gavin. Gavin backed up and grabbed Bryan. A fight started, and it lasted about forty-five seconds. A shot was then fired. According to Gavin, Devin would have been leaving or had left before the shooting, and Devin was never near the victim. Gavin stated he did not know where Defendant was at that time. The officer informed Gavin that multiple witnesses said Devin was present

15

and talking to the victim. Gavin indicated he thought Devin was wearing white shoes, jeans, and a blue shirt, but he was not certain. Gavin said Devin did not own a gun. Gavin described Defendant's hair and said Defendant was wearing jeans and a white t-shirt, and he had a goatee. If Devin had facial hair, it was a light stubble.

Gavin told police he did not see Defendant with a gun. He additionally stated Defendant could have been arguing with the victim. Gavin told police he did not see the shooting. The officer then told Gavin the victim died. Next, Gavin said he may have gotten into a fight with the victim, but he never punched anyone. Gavin was asked who got in the victim's face. Gavin then stated the victim tried to punch him, and Gavin threw a punch and missed the victim. Gavin then indicated that the way the officer was making it seem, Defendant was definitely around. Gavin discussed the phone call he made to Devin while at the scene and in the presence of police officers. The officer told Gavin there were cameras in the area. Gavin then said Defendant could have been there, but he was not remembering. Gavin then stated Defendant was always in a white shirt, and Defendant "is the best bet." However, he did not see who shot the victim. Gavin then stated that if Bryan was not next to him, it could only have been Defendant. Gavin said he was not going to say he was one hundred percent positive it was Defendant, but it looked that way to him. Gavin subsequently remembered Defendant being there when he turned around. He guessed the victim went after Defendant next. Gavin then stated he was starting to realize he remembered more of what happened and cried. He did not recall seeing the gunshot. The last thing he remembered was Defendant walking away. Gavin was adamant he did not see who shot the victim.

16

The first officer to question Gavin left the room, and a second officer entered the interview room. Gavin told the second officer that Devin may not have left before the shooting, but he should have been in the vehicle already. Gavin gave details consistent with those he had given to the first officer regarding the events leading up to the fight with the victim. Gavin then said he remembered Defendant being there and believed Defendant pushed the victim. The victim swung or pushed toward Defendant, and Gavin got between them and tried to push Defendant back. The victim then swung at Gavin. Someone grabbed Gavin and pulled him backwards. The victim then walked past Gavin. When Gavin turned around, a shot was fired. As Gavin turned around, Defendant was walking in the opposite direction, and the victim was still on his feet but then fell. Gavin said there was no way Defendant was in the vehicle with Devin. While Gavin was with police at the scene, he spoke to Devin by phone, telling him police wanted to speak to him. Gavin then clarified that he had information regarding Defendant's presence that he had not provided to the other officer during the first part of his interview. Gavin then stated he believed it was Defendant who shot the victim, and he saw Defendant there prior to shots being fired.

During his testimony, Gavin pointed out Defendant on a video. He agreed he changed his story when he spoke to Detective Maldonado as opposed to Detective White. Gavin was subsequently questioned as follows:

Q. Why did you change your story?

A. She definitely seemed to play a big part of it.

Q. Who did?

A. She put - - The detective. She put words in my mouth.

Q. Okay. Okay.

17

A. Because I just told the same story twice, except with two different names.

Q. Okay.

A. It went from Bryan to Benoit, for some reason.

Q. Okay.

A. Even though I know it was Bryan. That, whenever I got punched, I was breaking him and Bryan up from fighting.

Q. Not Tyler?

A. Not Tyler.

Q. Okay.

A. And, then, somebody came over my left shoulder. But I don't remember who that is. Because I know, if I would've knew [sic] who it was, I'd have been right there, the same way I was with Bryan.

Q. And you don't think Tyler had anything to do with this shooting, do you?

A. I don't believe. Because I - - Like I said, I would've been right there, just like I was with Bryan.

Gavin testified he did not recall anything about the person that shot the victim. He further testified that the first interviewer "put the idea of Benoit in my head, I guess. Because I don't remember - - I just remember a white t-shirt. But I don't remember a shooting."

Russell Ashton Dugas testified that he and Blanchard did not drink that night. He identified people he recognized in a video. He testified there was a group of guys yelling by a black SUV. The guy in the black shirt and one in a white t-shirt were the most upset. One of the guys at the black SUV darted back toward the club. Dugas let the group know, and the group brought him back. A couple of minutes later, Dugas saw the victim kneeling down by a girl. The guys

18

at the SUV started yelling at the victim. The victim said he was making sure the girl was okay and asked if they knew the girl. The guys then ran over to the victim. "The black t-shirt - - short black-sleeved t-shirt and the short-sleeved white t-shirt guys went over to him to see what was going on. And they, like - - were kind of, like, yelling at him, saying, like leave her alone, don't touch her, leave her alone." "[T]he black t-shirt guy," Defendant, and the victim were throwing punches. The guy wearing the black t-shirt was thrown to the ground. Thereafter, "the defendant walks around . . . like, circles around, runs around to the other side of this car, where we're standing." Dugas testified that he next heard a gun go off but did not see the moment the shot was fired. He stated, "And I look, and I see - - As his arm's going down, I see the gun in his hand." "[A]s I looked over, I noticed the gun going down." According to Dugas, the guy in the white t-shirt had the gun. He saw the black SUV drive away after the shooting. It looked like the shooter ran in the direction of the black SUV.

State's Exhibit 29, body-worn camera footage from Officer Asher Reaux, was played for the jury. The footage showed Blanchard and Dugas talking to the officer about what occurred. Dugas described a fight and said one of the guys involved was wearing a white shirt and had long, bushy, black hair and a short beard. Blanchard said she saw the shooter, and he was the guy wearing white who had a beard. The shooter then got into a dark gray Suburban. According to Dugas, one of the shooter's friends wore a mint green, long-sleeved shirt, and another wore a black shirt.

Dugas testified the mint green shirt was actually a white, long-sleeved shirt, and that person was not the shooter. According to Dugas, that person was by the SUV the entire time. Dugas indicated Defendant wore a short-sleeved, white t-

shirt. Dugas was shown a photograph in court and testified that the person shown was not the shooter, but he was involved in the fight and wore a black t-shirt. In describing his selection during the first lineup, Dugas testified that he knew the person he selected was one of the guys involved, and he was the one wearing the black shirt who was involved in the fight. He indicated he was told to identify anyone that was involved, and the form asked him to do the same.[5] Dugas testified that the form did not ask for any specifics, and there was more than one person involved. According to Dugas, he was not asked to identify who the shooter was, and he never told police the first lineup photo he selected was the shooter. Dugas addressed the second lineup, testifying he selected the shooter from that lineup, and he was absolutely certain of it.

Dugas testified that after he slept, memories came back. The next day, he recalled seeing the gun, although he indicated in his original statement to police that he did not see it.

Dugas was questioned about the lineups as follows:

Q.     . . . I thought you told me that you weren't sure about what they wanted. They just wanted the suspect. They didn't want the shooter. Isn't that what you told me?

A.     I mean, I didn't ask questions. Like, I was kind of just doing what they were asking me to do. I knew I was there because I had witnessed a shooting. I knew I was there because I saw - - I witnessed a shooting, I saw a fight break out, and I saw two people fighting against a victim, who did end up getting shot.

Q.     Okay.

A.     And, whenever they gave me the lineup, I recognized one of them being whatever his name is.

_____

[5] The "Lafayette Police Department Line-Up Identification Form" states, "SHOULD YOU RECOGNIZE A SUSPECT IN THE PHOTOGRAPHIC LINE-UP, PLEASE CIRCLE THE CORRESPONDING NUMBER LISTED BELOW FROM LEFT TO RIGHT."

. . . .

Q.    So Ms. White says: "Okay. You - - If you saw a picture of the guy who shot the victim, do you think you could recognize him?" And you said: "I'm pretty sure I could."

A.    (Indicated "Yes").

Q.    Right?

A.    Yes.

Q.    Is that correct? And, then, after that - - after that statement, you went and you identified Gavin White as the shooter.

A.    (Indicated "Yes").

Q.    Isn't that what you did?

A.    Yes. Because the shooter was not on the page. But I recognized Gavin White on the page. I recognized Gavin White, who was involved. And, the second round, I did recognize the shooter.

Dugas testified regarding the shooter, "I saw him run - - He ran towards the direction of the SUV. And I turned around and pushed Blair to go towards mine. And then, I heard all their doors close, and he wasn't around." He then testified the guy in the black shirt ran in the opposite direction. Dugas reviewed his statement to police and indicated Defendant got into the SUV. Dugas then indicated the shooter's hair was bushy, and he had a bushy beard. The guy in the black shirt had long, black hair.

State's Exhibit 32, Dugas' written statement, was made at the scene. In that statement, Dugas said he saw the assailant pull the gun from his pants and shoot the victim. Dugas testified, "I saw him, like, going down and, like, going back towards his pants with it."

Dugas was interviewed by Officer White. During that interview, Dugas gave his version of the events leading up to the shooting. He stated the shooter

was Gavin; had longer, bushy hair; wore a white t-shirt and jeans; and had a scruffy kind of beard. He indicated the shooter's friend was in a dark shirt, and the guy with the white shirt was the shooter. Dugas said he did not see the guy pull out the gun, but he heard a gunshot. The guy in the white shirt had the gun because the guy in the black shirt had just fallen to the ground, and it could not have been him. The SUV then left. However, he did not see the shooter get in the SUV.

Dugas testified he saw the guy in the black shirt at the police department that night, and that guy was not the shooter. He stated he did not see the shot go off, but saw the gun go down. Dugas made an in-court identification of Defendant as the shooter.

Devin White testified that Gavin and Defendant did not leave with him. He got into an argument with Defendant because Defendant opened the door before the vehicle was stopped. Gavin broke it up. Devin testified that he did not see a shooting, and he did not shoot anyone. Moreover, Defendant did not ride home with him. He was on the interstate by the Rayne exit when he learned there had been a shooting. He was wearing long sleeves and jeans on the night at issue. Gavin had hair down to his shoulders at that time.

Blair Blanchard testified that a person in the parking lot near an SUV was punching trees and light posts, and the people he was with referred to him as Tyler. The friends yelled his name trying to get him to leave. He wore a white t-shirt and jeans and had a shaggy beard. His hair was "[s]haggy [and] [l]onger." It was above his shoulders. Blanchard then testified that Tyler shot the victim. The shooter pulled a gun from his waistband during a fight that involved the victim. The shooter then ran back toward Dugas' truck. She did not recall seeing the

22

shooter get into the SUV. Blanchard was asked about her written statement in which she stated the shooter ran to a late model SUV. However, she testified that she did not actually see him get in the vehicle and admitted she was changing her story. Blanchard recognized Defendant in court. She remembered selecting the third photograph in the first lineup and testified she was not confident when she made the selection. She focused on the "facial hair, shaggy hair, I think, is what really got me." She recalled saying she was not sure about her selection. She saw the second lineup, but the shooter's hair was a lot longer than the people in the pictures. Blanchard was then shown a video clip and identified Defendant as the person wearing a white shirt and the person who shot Christon. The guy wearing the black shirt who was present at the police department was not the shooter.

Blair Blanchard's police interview, State's Exhibit 30, was played for the jury. At that time, she indicated a white male in a white shirt started arguing with the people who approached the girl. The guy in the white shirt pushed the victim, and a fight broke out. The guy wearing the white shirt then took a gun from his waistband and shot once. He then put the gun back and took off alone to an SUV. According to Blanchard, the suspect and two other guys were there. There was a male wearing a black shirt and a cap, and he had hair to his shoulders. Blanchard reported the suspect was called Tyler. The guy with long hair was still present when police came. The suspect had "longer hair as well and a beard as well." She was asked if his hair was to his shoulders, and she agreed.

Blanchard was questioned about the length of the shooter's hair. She indicated his hair was "about down to his shoulders." However, her statement indicated it was down to his shoulders. She admitted she selected Gavin in the first lineup. There was a discussion about Blanchard identifying Defendant with his

23

mask on without seeing his face.[6] Blanchard was shown her statement wherein she in fact indicated the shooter ran toward an SUV. She testified that she did not say he got into it. Blanchard was confident Defendant was the shooter. In her interview, she described a male wearing a black shirt, black hat, and having hair to his shoulders, and a beard. According to Blanchard, she was not describing the shooter at that time.

In brief to this court, Defendant suggests that in-court identification by Dugas is suspect because Dugas' memory developed after he slept, and he initially identified Gavin as the shooter. Defendant also suggests Blanchard's in-court identification is questionable because she initially identified Gavin as the shooter, and she failed to identify Defendant as the shooter in the second photographic lineup. Additionally, Blanchard hearing Defendant's name at the scene proves nothing more than his presence before the shooting. Defendant further argues that the fact that Devin fled from the scene lends credibility to Dugas' and Blanchard's identification of Gavin as the shooter. Defendant states: "Why would Devin White refuse to return to the crime scene even after he learned police were looking for him? Perhaps he needed to get rid of the gun Gavin used to shoot Mr. Chaisson."

Defendant next attacks his confession and statements made by others to police, arguing that police interrogation techniques resulted in statements that were unreliable and inconsistent. He contends he denied shooting the victim until he was lied to. He alleges misstatements by police caused him to change his story. Defendant contends Bryan changed his story as well due to permissible threats by police. Moreover, Gavin testified that police attempted to put words in his mouth.

_____

[6]After Blanchard testified that she recognized Defendant, he was asked to "take the facemask off and make sure."

Meanwhile, missing witnesses and possible suspects remain at large. Defendant suggests his confession was littered with doubtful words like "I guess." Furthermore, the more specific statement he gave to Detective Maldonado is questionable because police included conclusions and conjecture in their reports that misstated what witnesses said. According to Defendant, because the State failed to negate the reasonable hypothesis that Gavin or another individual who fled the scene shot Christon, the State failed to satisfy its burden of proof. Additionally, Defendant alleges that because the State failed to negate the reasonable hypothesis that Defendant's confession was the product of a deceptive interrogation technique used against a scared and confused young man, the State failed to satisfy its burden of proof.

Detective Maldonado testified that Defendant said he shot Christon. It is also obvious from Detective Suire's interview of Defendant that Defendant shot Christon. Bryan told police Defendant was the shooter, Gavin believed Defendant fired the shots, and Blanchard testified that the group present in the parking lot prior to the shooting called the shooter Tyler, Defendant's name. Additionally, Dugas picked Defendant as the shooter in the second photographic lineup presented to him, and he and Blanchard made in-court identifications of Defendant as the shooter.

Testimony and video evidence regarding what pertinent persons present wore support the conclusion that Defendant was the shooter. Gavin, Bryan, and Defendant were involved in the altercation with Christon. Bryan was not suspected of shooting Christon. Evidence indicated Gavin wore a black shirt and Defendant wore a short-sleeved, white t-shirt. Testimony from Bryan, Gavin, and Dugas suggested that Devin, who wore a long-sleeved, white shirt, was not

25

involved in the altercation at issue and was not the shooter. Moreover, Dugas and Blanchard testified that the guy wearing the black shirt, Gavin, did not shoot Christon despite their selection of his picture in the initial lineup that was presented to them.

A review of Gavin's interview with police, State's Exhibit 25, and his lineup photo, State's Exhibit 22(D), reveal his hair was much shorter in the picture used in the photographic lineup presented to Dugas and Blanchard. Additionally, Defendant's hair was longer in his interview with police, State's Exhibit 20, than in the lineup photograph used by police, State's Exhibit 22(E).

The jury heard the testimony regarding police interview techniques and testimony from witnesses who recanted their identifications of Defendant as the shooter, specifically Bryan and Gavin. The jury was also aware that Dugas and Blanchard identified Gavin in the initial lineup. Credibility is a determination left to the jury, and it was not irrational for the jury to accept Dugas' and Blanchard's explanations regarding their initial identification of Gavin. Moreover, there was no indication from witnesses to the shooting that the people who approached Angel at the same time as Christon were involved in the shooting. Based on the evidence and testimony presented, we find the State negated every reasonable probability of misidentification.

This conclusion is supported by *State v. Martin*, 15-77 (La.App. 5 Cir. 10/14/15), 177 So.3d 790, *writ denied*, 15-2121 (La. 11/18/16), 210 So.3d 283. Therein, the defendant challenged the testimony of two eyewitnesses, James Munson and Darkus Bellard, who identified him as the perpetrator of a murder. The defendant argued these eyewitnesses were not credible due to their criminal history and personal relationships with the victim. He alleged Munson was good

26

friends with the victim and had a personal interest in seeing someone punished for his friend's death. The defendant further argued that Munson had a criminal history and was serving a ten-year sentence when he changed his testimony again to identify the defendant as the shooter. The defendant alleged Bellard's testimony was unreliable because she served as a paid confidential informant and was under arrest for another matter when she gave her statement to police. The defendant also claimed the details and statements provided by these witnesses were inconsistent. He argued Munson wrote a letter recanting his statement identifying the defendant as the shooter. The defendant also complained that Bellard's testimony was contrary to Munson's because she claimed she heard arguing right before the victim was shot. The defendant further argued there were inconsistencies between Bellard's statement to the police, her grand jury testimony, and her court testimony. Specifically, defendant complained she changed her story about the direction she was coming from at the time of the shooting and whether a third person got into the car with the defendant. She also told detectives she heard defendant say, "'[h]e ain't gonna live to take the stand'" prior to the shooting, but at trial she denied telling this to the officers. *Id.* at 797.

The fifth circuit addressed the defendant's claims:

> In *State v. Cowart*, [01-1178 (La.App. 5 Cir. 3/26/02), 815 So.2d 275, *writ denied*, 02-1457 (La. 5/9/03), 843 So.2d 387], there was no physical evidence linking the defendant to the crime and a single witness identified the defendant as the perpetrator of a shooting. At trial, the defendant attacked the reliability of the eyewitness because she was a convicted felon, had been under psychiatric care, had initially lied to the police, gave a description that did not match the defendant, had perjured herself during motion hearings and changed her story about the crime scene and the number of shots she heard. Despite this lengthy list of deficiencies, this Court held it was within the jury's discretion to believe the witness' testimony. *Id.* at 285.

Recently, in [*State v.*] *Griffin*, [14-251 (La.App. 5 Cir. 3/11/15), 169 So.3d 473], this Court determined the evidence was sufficient to support the defendant's conviction for second degree murder based on the testimony of a single eyewitness. No physical evidence existed to link the defendant to the murder. The eyewitness was the victim's childhood friend and provided a statement identifying the defendant as one of three shooters two days after the murder. He did not know the defendant's name, but knew him from the neighborhood. The eyewitness did not testify because he died of multiple gunshot wounds prior to trial. Therefore, the jury only heard the eyewitness' taped statement and grand jury testimony. Various witnesses pointed out inconsistencies in the eyewitness' statement regarding his location when the shooting occurred. The eyewitness purchased beer prior to the shooting and had a conviction for a third offense driving while intoxicated.

Despite the lack of physical evidence linking defendant to the murder in the present matter, two eyewitnesses identified him as the shooter. Mr. Munson told police he saw defendant's face during the shooting and he identified defendant in a photographic lineup the day after the murder. Mr. Munson knew defendant prior to the shooting. Furthermore, it was not irrational for the jury to accept Mr. Munson's explanation as to why he wrote the letter recanting his initial statement to the police. Mr. Munson did not describe the shooter as having "dreads" to his shoulder at any other time. Defendant did not have long dreadlocks in the photographic lineup presented to and identified by Mr. Munson.

Furthermore, Ms. Bellard testified she saw defendant shoot Mr. Banks. She was afraid, had been placed in a witness protection program and did not want to testify at trial. As stated, a positive identification by only one witness is sufficient to support a conviction. *See Cowart*, *supra*.

In addition to the eyewitness testimony, defendant's close friend, Robert Causey, placed defendant near the scene of the murder when it occurred. Defendant's alibi witness, Danielle Lathers, provided a conflicting story claiming defendant went to her home after the Elm Street party. Ms. Winzy testified defendant was like family to her. She reluctantly acknowledged that she saw defendant bum a shirt, socks and shoes shortly after the murder outside the apartment building on Salem Street.

We find the jury made credibility determinations and chose to believe one or both of the eyewitnesses to the shooting over the testimony of defendant's alibi witnesses. A review of the record reflects the jury's credibility determinations were rational. Thus, viewing the evidence in the light most favorable to the prosecution,

we find the State proved defendant committed the second degree murder of Brian Banks beyond a reasonable doubt.

*Id.* at 797–98.

For these reasons, we find Defendant's conviction should be affirmed.

## ASSIGNMENT OF ERROR NUMBER TWO

In his second assignment of error, Defendant contends the trial court erred in imposing the maximum sentences inasmuch as he had no prior felonies, was a family man, had a job, and was compliant with house arrest for approximately four years. Moreover, there was no evidence of pre-planning or malice in the events leading to Christon's death. Defendant was charged with second degree murder and convicted of manslaughter.

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion. *State v. Barling*, 00–1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042–43 (citing *State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99), 746 So.2d 124, *writ denied*, 00–165 (La. 6/30/00), 765 So.2d 1067).

> . . . .

> "[Louisiana] Const. art I, § 20, guarantees that, '[n]o law shall subject any person to cruel or unusual punishment.' " *Barling*, 779 So.2d at 1042–43. "To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering." *Id.* at 1042 (citing *State v. Campbell*, 404 So.2d 1205 (La.1981)).

> The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *Barling*, 779 So.2d at 1042–43 (citing *State v. Cook*, 95-2784 (La. 5/31/96), 674 So.2d 957, *cert denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996)). In reviewing the defendant's sentence, the appellate court should consider the nature of the crime, the nature and background of the offender, and the

sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99–433 (La. 6/25/99), 745 So.2d 1183. "[T]he appellate court must be mindful that the trial court is in the best position to consider the aggravating and mitigating circumstances of each case. . . ." *State v. Williams*, 02-707 (La.App. 3 Cir. 3/5/03), 839 So.2d 1095, 1100 (citing *Cook*, 674 So.2d 957).

*State v. Rexrode*, 17-457, pp. 3-4 (La.App. 3 Cir. 11/15/17), 232 So.3d 1251, 1253-54 (second, third, and fourth alterations in original). "Generally, maximum sentences are reserved for the most serious violation of the offense and the worst type of offender." *State v. Herbert*, 12-228, p. 5 (La.App. 3 Cir. 6/13/12), 94 So.3d 916, 920, *writ denied*, 12-1641 (La. 2/8/13), 108 So.3d 78.

Defendant called four witnesses to testify at his sentencing hearing. The first was Dylan Lemaire, who employed Defendant as an electrical helper. Dylan indicated Defendant was an exemplary worker.

The next witness was Kelli Duhon. Kelli was engaged to Defendant. They lived together and had a daughter who was almost three years old. Duhon addressed Defendant's relationship with their daughter and the impact his absence would have on the child's life. Duhon then testified that Defendant supported his family. Duhon noted Defendant was not aggressive and was a kindhearted person. Tori Garner, Defendant's mother, subsequently testified. She addressed Defendant's personality in high school, noting he was voted friendliest student in his class and did not get into fights. Tori also indicated Defendant was a good father. Thereafter, Defendant apologized to the victim's family.

The State called Kelly Chaisson, the wife of the victim. She testified regarding the impact her husband's death had on her and her son, who was three years old at the time of his father's death. She requested imposition of a maximum sentence. The State also called Phillip Alexander, a friend of the victim. He

addressed his relationship with the victim and the victim's impact on his family and the community. Shanena Chaisson, the victim's sister, was the next person called by the State. She addressed her relationship with her brother and his relationship with his son.

In argument to the trial court, defense counsel noted Defendant was nineteen years old at the time of the offense.

The judge mentioned the following when imposing Defendant's sentences:

So I have -- I have considered all of the issues that have been brought up. And I do make the following findings regarding the sentence in this case:

I do note, as [defense counsel] said, that you have no prior convictions. And I know that you were young at the time you committed the offense. But you stand convicted of killing another human being.

The crime of manslaughter is a crime of violence. You used actual violence and a firearm during the commission of this offense.

As we can see, your actions have had a significant impact on the victim's family, and, to a large extent, you have not accepted responsibility for your actions in this case.

Therefore, I think it is appropriate and I do sentence you, for the crime of manslaughter, to 40 years at hard labor. And, for the crime of obstruction of justice, to 20 years at hard labor. But these sentence are to run concurrently with each other. And you will receive credit for any time you've served on this charge.

Manslaughter is punishable by imprisonment for up to forty years at hard labor. La.R.S. 14:31. Defendant received the maximum sentence for this offense. Defendant alleges this sentence is excessive. He notes he was nineteen years old at the time of the offense, he was engaged, he had a two-year-old daughter when sentenced, he had an established work history, he provided for his family, and he had no history of fighting or violent behavior. Defendant cites to cases wherein

31

twenty-five year sentences for manslaughter occurring during robberies were imposed and affirmed on appeal.

Defendant believes that his case does not involve the intent or callous action common in cases wherein the maximum sentence has been imposed. Given *State v. Banks*, 16-34 (La.App. 3 Cir. 6/1/16), 194 So.3d 1224, and *State v. Wright*, 10-577 (La.App. 5 Cir. 2/15/11), 61 So.3d 88, *writ denied*, 11-560 (La. 9/30/11), 71 So.3d 283, which both involved deaths occurring during the commission of felonies, Defendant believes his case should be remanded for imposition of a sentence "well less than 25 years of hard labor" for manslaughter.

We will now address sentences imposed in similar cases. In *State v. Sterling*, 21-618, p. 1 (La.App. 3 Cir. 3/9/22) (unpublished opinion), the defendant was charged with second degree murder after he approached and shot the victim and another man when the two "did square up as to take a fighting posture." The seventeen-year-old defendant pled guilty to manslaughter and was sentenced to twenty years at hard labor. This court discussed sentences imposed in manslaughter cases:

> In *State v. Wright*, 10-577 (La.App. 5 Cir. 2/15/11), 61 So.3d 88, *writ denied*, 11-560 (La. 9/30/11), 71 So.3d 283, the defendant, who was fifteen years old at the time, charged with second degree murder and armed robbery, was found guilty of manslaughter by a jury. The defendant received twenty-five years at hard labor on the conviction for manslaughter. He appealed the sentence as excessive because of his youth, asserting that there was no evidence that he shot the victim. While noting that the defendant did have an extensive juvenile criminal history, the fifth circuit did not find the sentence excessive under the circumstances, despite the defendant's age.
>
> In a majority opinion, *State v. Cedars*, 16-1044 (La.App. 3 Cir. 7/19/17) (unpublished opinion), *writ denied*, 17-1343 (La. 4/27/18), 239 So.3d 838, this court upheld a juvenile's thirty-year sentence for manslaughter. The juvenile, who had originally been charged with second degree murder, pled guilty to the lesser charge of manslaughter. In upholding the sentence, this court stated that "the

32

trial court clearly considered numerous factors in the formation of the Defendant's sentence, including his youth . . . and balanced those factors against the violent nature of the offense and the Defendant's reduced sentencing exposure under a manslaughter plea." *Id.* at 8.

In *State v. Banks*, 16-34 (La.App. 3 Cir. 6/1/16) 194 So.3d 1224, a defendant who was seventeen years old at the time of the offense pled guilty to one count of manslaughter and one count of simple robbery pursuant to a plea agreement. He was then sentenced to twenty-five years at hard labor on the conviction for manslaughter and three years at hard labor on the conviction for conspiracy to commit simple robbery. The defendant then appealed, alleging that his sentence of twenty-five years for manslaughter was excessive. However, this court upheld the sentence, noting that the "[d]efendant received a significant benefit from pleading guilty to manslaughter[,]" as the evidence could have easily resulted in a conviction of first degree murder. *Id.* at 1231.

Id. at p. 4.

We find that the trial court abused its sentencing discretion in imposing a forty-year sentence for a first-time felony offender with no prior issues. Maximum sentences are imposed for the most egregious offenses committed by the worst type of offender. *State v. Soileau*, 13-772 (La.App. 3 Cir. 2/12/14), 153 So.3d 1008, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261. Defendant is not the worst type of offender, and a maximum sentence in this case makes no meaningful contribution to acceptable penal goals. Defendant is a young family man who has no history of crime or violence. He is likely a good candidate for rehabilitation.

Therefore, we vacate and set aside Defendant's sentence of forty years for manslaughter and remand to the trial court for resentencing pursuant to La.Code Crim.P. art. 881.4(A).

Defendant also argues his sentence of twenty years is the maximum sentence for obstruction of justice and is excessive. Louisiana Revised Statutes 14:130.1 provides:

A. The crime of obstruction of justice is any of the following when committed with the knowledge that such act has, reasonably may, or will affect an actual or potential present, past, or future criminal proceeding . . . .

. . . .

B. Whoever commits the crime of obstruction of justice shall be subject to the following penalties:

(1) When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both.

(2) When the obstruction of justice involves a criminal proceeding in which a sentence of imprisonment necessarily at hard labor for any period less than a life sentence may be imposed, the offender may be fined not more than fifty thousand dollars, or imprisoned for not more than twenty years at hard labor, or both.

The applicable sentencing range is determined by the type of investigation and/or the offense charged. In *State v. Harvey*, 21-730 (La.App. 4 Cir. 5/25/22), 345 So.3d 1043, *writ denied*, 22-953 (La. 9/20/22), 346 So.3d 803, the defendant was acquitted of second degree murder but convicted of obstruction of justice involving a second degree murder investigation or proceeding and sentenced to forty years. On appeal, the defendant argued the jury acted irrationally in finding him guilty of obstruction of justice considering that it rendered a not guilty verdict on the charge of second degree murder, and the State would have to prove he was responsible for the victim's death before the jury could conclude that he obstructed justice in the investigation of that death. The fourth circuit concluded:

> Defendant's argument is without merit. As the Louisiana Supreme Court observed in *State v. Quinn*, 19-00647, p. 9 (La. 9/1/20), 340 So.3d 829, [835] (per curiam), *cert. denied*, --- U.S. ----, 141 S.Ct. 1406, 209 L.Ed.2d 139 (2021):
>
> > One can be found guilty of obstructing a murder investigation although the investigation does not

34

> ultimately result in a conviction for murder. . . . *See State v. McKnight*, 98-1799, pp. 13-14 (La. App. 1 Cir. 6/25/99), 739 So.2d 343, 352-353, *writ denied*, 99-2226 (La. 2/25/00), 755 So.2d 247. To find otherwise would be to reward those who more successfully obstruct justice while punishing those who obstruct with less success.

*Id.* at 1050 (second alteration in original).

In *State v. Manuel*, 21-273 (La.App. 4 Cir. 4/6/22), 337 So.3d 967, the defendant was tried for second degree murder, attempted second degree murder, obstruction of justice, and carrying a concealed firearm. The jury could not reach a verdict on the count of second degree murder. On the count of attempted second degree murder, the jury returned a verdict of guilty of attempted manslaughter, and on the count of obstruction of justice, the jury returned a verdict of attempted obstruction of justice. The trial judge also found the defendant guilty of the misdemeanor count of carrying a concealed firearm. In addressing the excessiveness of the defendant's sentence for attempted obstruction of justice, the fourth circuit stated:

> In this case, the criminal proceeding in which defendant was charged with obstruction of justice involved a second degree murder charge, for which a sentence of life is mandatory. Consequently, the maximum possible sentence to be imposed on defendant was forty years for obstruction of justice, and twenty years for attempted obstruction of justice.

*Id.* at 975, n.5.

In *State v. Yelverton*, 12-745 (La.App. 5 Cir. 2/21/13), 156 So.3d 53, *writ denied*, 13-629 (La. 10/11/13), 123 So.3d 1217, the defendant was charged with second degree murder and convicted of manslaughter. He was also convicted of obstruction of justice. In discussing his sentence for obstruction of justice, the fifth circuit stated:

35

With regard to the obstruction of justice conviction, at the time of the offense, La. R.S. 14:130.1(B)(1) provided: "When the obstruction of justice involves a criminal proceeding in which a sentence of death or life imprisonment may be imposed, the offender shall be fined not more than one hundred thousand dollars, imprisoned for not more than forty years at hard labor, or both." The defendant was originally charged with second degree murder, which provided for a penalty of life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant was subsequently sentenced to 10 years imprisonment on the obstruction of justice conviction. Thus, we find that the defendant's sentence is within the statutory limits listed above for count two.

*Id.* at 65.

Louisiana Revised Statutes 14:130.1 references a "criminal proceeding," not a conviction. Based on the wording of the statute and the above-cited cases, obstruction of justice is punishable by a maximum of forty years in this case. "This is a very lengthy sentence which indicates that obstruction of justice involving a very serious crime, like second degree murder, is also a serious offense." *State v. Cawthorne*, 18-155, p. 9 (La.App. 3 Cir. 10/3/18), 257 So.3d 717, 726, *writ denied,* 18-1899 (La. 4/8/19), 267 So.3d 607.

In *State v. Ray*, 10-1126 (La.App. 4 Cir. 6/29/11), 70 So.3d 998, the second circuit upheld a fifteen-year sentence for obstruction of justice, which was to run concurrently with a thirty-year sentence for manslaughter, for a defendant with a minimal criminal history who had been tried for second degree murder.

In *State v. Royal*, 03-439 (La.App. 5 Cir. 9/30/03), 857 So.2d 1167, *writ denied*, 03-3172 (La. 3/19/04), 869 So.2d 849, the court affirmed a forty-year maximum sentence for obstruction of justice for a defendant that threw the murder weapon into the river after committing second degree murder.

In *Harvey*, 345 So.3d 1043, the court affirmed the defendant's maximum sentence for obstruction for disposing of the gun used to kill the victim and telling police he gave it to another man.

Based on the cases cited, we find the trial court did not abuse its discretion in imposing a twenty-year sentence for obstruction of justice.

## CONCLUSION

Defendant's conviction for manslaughter and his sentence for obstruction of justice are affirmed. His sentence for manslaughter is vacated and set aside and the case is remanded to the trial court for resentencing.

**CONVICTION FOR MANSLAUGHTER AFFIRMED; SENTENCE FOR OBSTRUCTION OF JUSTICE AFFIRMED; SENTENCE FOR MANSLAUGHTER VACATED AND SET ASIDE AND REMANDED FOR RESENTENCING.**